

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-21-2009

# Berrier v. Simplicity Mfg Inc

Precedential or Non-Precedential: Precedential

Docket No. 05-3621

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"Berrier v. Simplicity Mfg Inc" (2009). *2009 Decisions.* Paper 1432.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1432

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No: 05-3621

———————

WAYNE BERRIER; BRENDA GREGG, in their own right
and as parents and natural guardians of Ashley Berrier, a
minor,

Appellants

v.

SIMPLICITY MANUFACTURING, INC.,

Third-Party Plaintiff

v.

SUSIE SHOFF;
MELVIN SHOFF,

Third-Party Defendants

———————

Appeal from the United States District Court
for The Eastern District of Pennsylvania
(Civil Action No. 04-cv-00097)

District Court: Hon. Legrome D. Davis

Argued: January 8, 2007

Before: McKEE, AMBRO, and FISHER
Circuit Judges

(Opinion filed: April 21, 2009)

ALAN M FELDMAN, ESQ. (Argued)
DANIEL J. MANN, ESQ.
Feldman, Shepherd, Wohlgelernter,
Tanner, & Weinstock
1845 Walnut Street, 25th Floor
Philadelphia, PA 19103
Attorneys for Plaintiffs - Appellants

SHANIN SPECTER, ESQ. (Argued)
DAVID J. CAPUTO, ESQ.
Kline & Specter
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
Attorneys for *Amicus Curiae*
The Pennsylvania Trial Lawyers
Association

NANCY SHANE RAPPAPORT, ESQ. (Argued)
JAMES M. BROGAN, ESQ.
DLA Piper Rudnick Gray Cray US, LLP

One Liberty Place, Suite 4900
1650 Market Street
Philadelphia, PA 19103

DONALD H. CARLSON, ESQ.
Crivello, Carlson & Mentkowski
710 North Plankinton Avenue, Suite
Milwaukee, WI 53203
<u>Attorneys for Appellee Simplicity Manufacturing, Inc.</u>

JAMES M. BECK, ESQ.
Dechert
2929 Arch Street, 18th Floor, Cira Centre
Philadelphia, PA 19104

HUGH F. YOUNG, JR., ESQ.
Of Counsel:
Product Liability Advisory Council, Inc.
1850 Centennial Park Drive, Suite 501
Reston, VA 22091
<u>Attorneys for *Amicus Curiae* Product Liability
Advisory Council</u>

JOHN F. LEWIS, ESQ.
Swartz Campbell
50 South 16th Street
Two Liberty Place, 28th Floor
Philadelphia, PA 19102
<u>Attorney for Third Parties - Appellees Susie Shoff and
Melvin Shoff</u>

---

OPINION

---

McKEE, Circuit Judge.

The primary issue in this appeal is whether
Pennsylvania's strict products liability law extends to a child
who was injured when her grandfather backed over her foot
while using a riding mower that lacked "back-over"
protection. The Pennsylvania Supreme Court has never
expressly determined if one who is merely a bystander and
not a user of a product can bring a products liability claim
against a manufacturer to recover for injuries that occur while
an intended user is using the manufacturer's product. We
predict that if the Pennsylvania Supreme Court were
confronted with this issue, it would adopt the Restatement
(Third) of Torts, §§ 1 and 2, and thereby afford bystanders a
cause of action in strict liability under the circumstances
here.[1]  Accordingly, we will reverse the district court's grant
of summary judgment in favor of the manufacturer on the
strict products liability claim. We will also reverse the district
court's grant of summary judgment in favor of the
manufacturer on the plaintiffs' negligence claim.

---

[1] For convenience, we will frequently refer to the
Pennsylvania Supreme Court as the "Supreme Court," or the
"Court."

4

# I. FACTS

## A. The Accident

Wayne Berrier and Brenda Gregg are the parents of Ashley Berrier, a minor. On May 7, 2003, Ashley was visiting her grandparents at their home in Honeybrook, Pennsylvania. Her grandfather, Melvin Shoff, was mowing his yard with his Simplicity Regent Model riding mower. Shoff had purchased the mower new from a retailer in 1994.

According to Shoff, Ashley came into the yard and attempted to hand him a flower while he was mowing. Shoff disengaged the mower blades and told her to go inside. Believing she had done as instructed, Shoff then re-engaged the blades and placed the mower in reverse to turn the mower around. As he was backing up with the blades engaged, he backed over Ashley's left leg. Although Ashley received prompt medical attention at a prominent children's hospital, her left foot had to be amputated.

Thereafter, Ashley's parents brought this action in their own right and on Ashley's behalf (plaintiffs are collectively referred to as the "Berriers") against Simplicity. They argued that Simplicity was liable for negligently designing the mower and also strictly liable because the design was defective. Both claims centered on the absence of any back-over protection, such as a "no mow in reverse" device or roller barriers.

The Simplicity mower Shoff was using was a Regent

12 HP Hydrostatic lawn tractor, model number 1692403. It had been manufactured in 1994 and was equipped with a 36-inch steel mower deck that housed two rotating blades. The mower was intended to be operated only by an adult and designed accordingly. The operator could control the mower's movement and blade engagement. The operator could therefore move the mower forward or in reverse, with or without the blades engaged. The blades could be engaged or disengaged using a "PTO [power take off] lever" on the left side of a control panel. No physical barriers obstructed the operator's view. Information that accompanied the mower clearly warned that it should not be operated while anyone was within the mower's area of operation.

Simplicity equipped the mower with three electrical safety systems to prevent the engine from starting unless the transmission and blade controls are in "stopped" positions. This stopped the engine and blades if the operator left the seat without disengaging the blades, and the configuration automatically stopped the engine if the operator left the seat without first setting the parking brake. However, the mower was not equipped with any "no mow in reverse" ("NMIR") device nor any kind of roller barrier at the rear of the mowing deck.[2]

_____

[2] The NMIR is a general category of devices that are broadly defined as mechanisms that would either: (a) prevent a mower's blades from remaining on if the mower is shifted into reverse; (b) stop the engine and/or blade(s) when the mower is changed to reverse; or (c) prevent reverse motion when the mower blade is engaged. *See* App. at 732 (Berrier's

6

The mower came equipped with warnings and instructions printed in bold black letters against a yellow background, located at the operator's position on the machine that warned of "serious injury or death" that could occur if the machine was operated "WHEN CHILDREN OR OTHERS ARE AROUND." Additional warnings and safety rules pertaining to the danger of amputation and the risk of accident were placed on the deflector shield. Similar warnings were also printed in the Operator's Manual, and Shoff admitted that he read and understood them.

## B. History of Back-Over Protection on Riding Mowers

In the 1970's and 80's, a series of studies warned about the extreme dangers associated with operating riding mowers in reverse with blades engaged. These studies were conducted by the Consumer Product Safety Commission ("CPSC")[3] and others. The studies cited back-over blade contact accidents, comprising between nine and eleven percent of reported accidents involving riding mowers, as the most tragic type of lawnmower accidents. These accidents

Expert Report); *see also* App. at 576 (Simplicity inter-office correspondence regarding NMIR standard). Roller barriers provide an alternative method for back-over protection. They are described more fully below.

[3]The CPSC is the government agency charged with protecting the public from unreasonable risks of serious injury or death from various types of consumer products.

almost always involved children under the age of five, and almost always resulted in amputation or death. Calculations based on these studies demonstrated that back-over accidents happened at a rate of more than 100 per year, and one such accident occurred for each 5-6,000 riding mowers sold in the United States. App. 550, 555. In December of 1974, a study commissioned by the CPSC recommended that all riding mowers be equipped with a mechanism that would automatically stop the blade while the mower was in neutral or reverse. The Consumers' Union of the United States ("CU") echoed the call for this requirement in a proposed standard issued on July 17, 1975.[4]

In 1977, the CPSC published a "Proposed Safety Standard" in the Federal Register that would have required all riding mowers to include back-over protection in the form of a device that would disengage the blades while the mower was in reverse. In 1984, following requests from the industry trade association, certain sections of the proposed mandatory CPSC requirements were withdrawn. The withdrawn sections included the requirement that an NMIR device be incorporated into the design of riding mowers. The withdrawal was premised on the CPSC's belief that a voluntary standard developed by the industry with comment and assistance by the CPSC would be "a more efficient use of the commission's resources." App. 575.

---

[4] The Consumer's Union is a nonprofit consumer research organization that is probably best known for its publication of "Consumer Reports Magazine."

Nonetheless, the CPSC continued to recognize that "based on engineering judgment, riding mowers meeting these requirements [including reverse operations with the blade disengaged] should be safer than those that do not." App. 576. Accordingly, the CPSC sent a letter to the Outdoor Power Equipment Institute ("OPEI") requesting that an NMIR feature with an option for manual override be included in any revised American National Standards Institute ("ANSI") standard for riding mowers.[5] The Commission's rationale included the following statement:

> These provisions offer a reasonable means to begin to address young children backed over during reverse mowing. While these accidents are infrequent, the population at risk and the severe mental trauma to the child's family fully support the need to take immediate steps . . . . Overall, the requirement can address the serious back up hazard while still permitting maximum freedom to designers.

App. 548-49.

In 1994, the CPSC further articulated industry concerns regarding the efficacy of NMIR devices, including issues relating to how fast the blade should stop to avoid blade contact injuries, whether consumers would accept a mower that does not mow while backing up, and whether the

---

[5] The OPEI is the industry trade group that drafted the ANSI safety specifications for riding mowers. App. 209.

safety change could be incorporated into the product without diminishing  customer satisfaction.  Those and similar concerns ultimately lead to the defeat of attempts to incorporate a mandatory NMIR design into riding mowers.

### C. The Effectiveness of Back-Over Protection Devices

In the wake of discussions about lawn mower design, different types of NMIR devices have been designed to prevent the motor from powering the blade if an operator shifts a riding mower into reverse.[6]  In fact, in 1976, Simplicity received two patents for mechanical and electrical interlocks that prevent blades from spinning while a riding mower is backing up.  App. 588-89.

NMIR devices often include an "override" feature that conditions reverse mowing upon a series of maneuvers (*e.g.*, an override button) that compel the operator to focus his/her attention on backing up and take some action to power the blades while the mower is operating in reverse.  However, even with such an option, the blades will automatically stop

---

[6] These devices include: (1) a blade brake which stops the blades each time the mower is shifted into reverse; (2) automatically stopping the engine if the mower is shifted into reverse without the operator disengaging the blades; (3) automatically locking the wheels if the blade is still spinning while the mower is shifted into reverse; and (4) an interlock which prevents the mower from being shifted into reverse if the blades are spinning.  App. 556-58.

when the mower is shifted into reverse in normal operation. App. 557.

In 2003, the new ANSI standards, drafted by OPEI, required an NMIR design. App. 578-80. Thereafter, in September 2004, Simplicity incorporated NMIR devices into its riding mowers.[7]

---

[7] Rule 56 of the Federal Rules of Civil Procedure requires that only admissible evidence be offered in summary judgment proceedings. Evidence of subsequent remedial measures is not admissible to prove negligence, culpable conduct, a defect in a product, a defect in a product's design, or a need for a warning or instruction. Fed. R. Evid. 407. However, subsequent remedial measures need not be excluded if, as here, they are introduced for the purpose of demonstrating the feasibility of the design. *Id.* The district court did not discuss this evidence, nor explain why it was not considered.

The Product Liability Advisory Council, *Amicus Curiae* in support of Simplicity, contends in a footnote that Berrier's evidence of subsequent design changes as well as subsequent (ANSI) industry standards, is inadmissible to show negligence and strict liability. It cites *Duchess v. Langston Corp.*, 769 A.2d 1131, 1145 (Pa. 2001) (recognizing that the general proscription against the admission of evidence of subsequent remedial measures precludes use of a subsequent design change as substantive evidence of a product defect in a strict products liability case), and *Lewis v. Coffing Hoist Division*, 528 A.2d 590, 594 (Pa. 1987) (industry standards are inadmissible in strict liability), in

11

support of its position.

However, there are several reasons why this evidence can be considered. First, the Council is correct that Pennsylvania law generally prohibits the admission of evidence of subsequent remedial measures, including the use of a subsequent design change as substantive evidence of a product defect in a strict products liability case. *See Duchess* at 1145. However, like the Federal Rule governing admissibility, where the machine manufacturer places feasibility in issue, exceptions in the rule governing subsequent remedial measures are admissible to establish the feasibility of the alternate design. *Id.* at 1150; *see also* Pa. R. Evid. 407 (excepting from the rule evidence that proves controverted matters including feasibility of precautionary measures).

Second, the "industry standard" evidence excluded in *Lewis* was offered by the defendants as part of their defense to a strict liability claim. *See LaBelle ex rel. LaBelle v. Philip Morris, Inc.*, 243 F. Supp. 2d 508, 520 (D.S.C. 2001) (distinguishing *Lewis*, 528 A.2d 590). *Lewis* does not address whether industry standard evidence is inadmissible in a design defect claim based on a negligence theory, nor does it hold that the safety designs available at the time of manufacture have no relevance to a strict liability design defect claim. For the Berriers to sustain their negligence claim, they must show that Simplicity failed to exercise due care. Evidence of alternate designs is admissible to refute Simplicity's claim that NMIR devices would decrease the social utility of the mower, *see* Pa. R. Evid. 407, as well as to show the "state of the art" of safety design at the relevant time. *See Phatak v.*

12

## D. Alternative Designs Suggested
## by the Berriers

The Berriers suggest several alternative designs that could have been incorporated into Simplicity's mower. The first is an NMIR feature that prevents the blades from being powered by the motor when the mower is shifted into reverse. App. 374. However, even with loss of power, momentum causes the blades to continue to spin for a short time as the mower is backing up. *Id.* The feature requires disengagement and re-engagement of the blades each time the mower reverses direction. App. 35. This design was being used by one lawn mower manufacturer, MTD Products Inc., when Shoff's mower was manufactured.[8] App. 767.

The Berriers also suggest an NMIR feature that utilizes the aforementioned "override" switch that would allow the operator to choose to mow in reverse as needed or for an entire mowing session. ("Override Device") App. 375. This design is now required by the 2003 ANSI standards. App. 579.

The final alternative design suggested by the Berriers

*United Chair Co.*, 756 A.2d 690, 693 (Pa. Super. 2000). The evidence may be similarly relevant to the Berriers' strict liability theory.

[8] We will therefore refer to this feature as the "MTD design."

is roller-guards on the back of the mowing deck. They create a barrier that greatly reduces the risk of any "foreign object" slipping under the deck (*i.e.* blade housing) as the mower is backing up. A Simplicity engineer and the Berriers' design expert both testified that roller-barriers reduce injuries. App. 593-96, 553-54. In fact, Simplicity asked OPEI to adopt this design based on testing it had conducted that supported the effectiveness of the roller-barrier in preventing back-over injuries.[9] App. 593-94, 597-98.

## II. DISTRICT COURT PROCEEDINGS

Following Ashley's injury, the Berriers filed this action against Simplicity in the Court of Common Pleas of Philadelphia County. The complaint contained one count of strict products liability based on Section 402A of the Restatement (Second) of Torts (Count I), and a second count sounding in negligence (Count II). As noted earlier, both counts alleged a cause of action based on an allegedly defective design.[10]

---

[9] Roller barriers function much the same way as the old "cow catcher" that used to be designed into the front of railroad locomotives to sweep any foreign objects from railroad tracks in advance of the engine to which it was attached.

[10] The complaint also asserted that the warnings on the mower were defective. The district court wrote that it "fail[ed] to understand what additional warnings would be more effective in preventing back-over accidents." *Berrier v.*

Simplicity removed the case to the district court based on diversity of citizenship, 28 U.S.C. § 1332, and filed an answer. Sometime thereafter, Simplicity filed a third-party complaint against Mr. and Mrs. Shoff, which was later amended, alleging claims of negligent supervision and of failure to follow instructions. Simplicity's third-party complaint sought contribution from the Shoffs in the event that it was found liable.

In time, Simplicity and the Shoffs, the third-party defendants, filed motions for summary judgment. Simplicity sought summary judgment on the strict liability and negligence claims. The Shoffs sought partial summary judgment on the negligent supervision and failure to follow instructions contribution claims.

The district court granted summary judgment to Simplicity on both counts and dismissed the Berriers' complaint. *Berrier v. Simplicity Corp.*, 413 F. Supp.2d 431 (E.D. Pa. 2005). The court ruled that Pennsylvania strict products liability law does not permit recovery for injuries to anyone other than the intended user. Because Ashley was a bystander and not an intended user of the mower, she could not recover in an action against Simplicity. *Id.* at 437-43.

_____

*Simplicity Corp.*, 413 F. Supp.2d 431, 446 (E.D. Pa. 2005). Indeed, it noted that the Berriers' own expert testified at his deposition that additional warnings, both in the manual and on the mower, would not, standing alone, be effective in preventing future accidents. *Id.* The Berriers do not assert in this appeal that the warnings were defective.

15

Since the court also concluded that, under Pennsylvania law, Simplicity did not owe a duty to bystanders, it dismissed the negligence claim as well. *Id*. at 443-49.

The court also ruled that the award of summary judgment "moots the contribution claim against [the Shoffs], and, hence, the need to resolve [the Shoffs'] motion for summary judgment." 413 F. Supp.2d at 449. Nonetheless, it decided the Shoffs' motions "in the event plaintiffs are successful on a motion for reconsideration or on appeal, and because Simplicity has not argued for dismissal based on mootness." *Id*. The court then denied the Shoffs' motion for summary judgment on Simplicity's negligent supervision claim, but granted summary judgment in favor of Mrs. Shoff only on Simplicity's failure- to-follow-instructions claim. *Id*. at 449-52.

This appeal followed.

### III. JURISDICTION & STANDARD OF REVIEW

The district court had diversity jurisdiction pursuant to 28 U.S.C. § 1332. We have jurisdiction pursuant to 28 U.S.C. § 1291. "The standard of review applicable to the District Court's order granting summary judgment is plenary." *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 466 (3d Cir. 2005). We apply "the same test employed by the District Court under Federal Rule of Civil Procedure 56(c)." *Id.* The non-moving party "is entitled to every favorable inference that can be drawn from the record." *Id.* At the summary judgment stage, "the judge's function is not . . . to weigh the evidence and

16

determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Equimark Commercial Finance Co. v. C.I.T. Financial Services Corp.*, 812 F.2d 141, 144 (3d Cir. 1987).

## IV. DISCUSSION

### A. Bystander Recovery Under Pennsylvania's Strict Products Liability Law.

The district court relied primarily upon *Phillips v. Cricket Lighters*, 841 A.2d 1000 (Pa. 2003), in holding that Ashley could not recover in strict liability under Pennsylvania law because she was not an intended user of the mower. However, as we discuss in detail below, we believe the district court's reliance on *Phillips* was misplaced because bystander liability was not an issue in that case; moreover, no other decision of the Court specifically addresses the issue.

In the absence of a controlling decision by the Pennsylvania Supreme Court, a federal court applying that state's substantive law must predict how Pennsylvania's highest court would decide this case.[11] *See Nationwide Mutual Ins. Co. v. Buffetta*, 230 F.3d 634, 637 (3d Cir. 2000). "In predicting how the highest court of the state would resolve

---

[11]Because we are sitting in diversity, we must apply Pennsylvania's law to the facts of this case. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). All parties agree that Pennsylvania law governs this suit and the district court applied Pennsylvania law in granting summary judgment.

17

the issue, [we] must consider 'relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand.'"[12] *Id.* (quoting *McKenna v. Ortho Pharm Corp.*, 622 F.2d 657, 663 (3d Cir. 1980)). Although the Pennsylvania Supreme Court has not yet expressly recognized a bystander's right to recover under products liability law, it has not expressly rejected such a claim either.

The "modern era" of products liability law in Pennsylvania began with *Webb v. Zern*, 220 A.2d 853 (Pa. 1966). There, Webb's father bought a keg of beer from Zern (a beer distributor), and Webb's brother subsequently tapped the keg and drew beer from it. Webb was injured when the keg exploded. *Id.* at 426. Webb relied on a theory of "exclusive control" to sue both Zern, the brewer who filled the keg, and the manufacturer of the keg. The trial court dismissed the action pursuant to the defendants' demurrers. That court ruled that the doctrine of exclusive control did not apply because Webb had not joined his father and brother and either or both of them could have done something that caused the explosion.

On appeal, the Supreme Court adopted the Restatement

---

[12]The district court did not conduct a prediction analysis. However, we can do a prediction analysis because, had the district court conducted such an analysis, our review of that analysis would be plenary. *Nationwide Mutual Ins. Co. v. Bufetta*, 230 F.3d 634, 637 (3d Cir. 2000)

(Second) Torts, Section 402A as a "new basis of liability." *Id.* at 426-27.  Section 402A provides:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.[13]

Restatement (Second) of Torts § 402A.

The Court did not fully explain its rationale for adopting Section 402A.  Rather it simply referred to the concurring and dissenting opinions in *Miller v. Preitz*, 221 A.2d 320 (Pa. 1966), which was issued the same day as *Webb*,

---

[13]The term "seller" includes the "manufacturer" of a product.  Restatement (Second) of Torts, § 402A, cmt. *f*.

19

stating: "[o]ne will . . . find there citations to modern case law and commentaries which extend and recommend the extension of the law of strict liability in tort for defective products."  220 A.2d at 854.

In his concurring and dissenting opinion in *Miller*, Justice Jones recited the history of product liability law in Pennsylvania prior to *Webb*.  *Miller*, 221 A.2d at 328-35 (Jones, J., concurring in part and dissenting in part).  He explained that a person injured by a defective product could sue either in negligence or in assumpsit based upon a breach of implied warranty arising from the sale of an allegedly defective product.  *Id*. at 329.  However, under either theory the injured person was required to establish privity, *id*. at 329, 330, and, in a negligence action, the injured person had to prove the specific acts of negligence by the manufacturer.  *Id*. at 330.

In his recitation, Justice Jones noted that following the landmark case of *MacPherson v. Buick Motor Co.*, 111 N.E. 1050 (N.Y. 1916), Pennsylvania had eliminated the requirement of privity in negligence actions for damages arising from a defective product.  *Id*. at 329.  However, in an assumpsit action based on a breach of warranty, privity was still required.  *Id*. at 330.  As a result of the privity requirement, a manufacturer's liability in a breach of warranty action was limited to his immediate purchaser, who was generally a retailer who sold the product directly to the consumer.  *Id*. at 332.  The retailer was therefore normally only liable to the actual purchaser and not to subsequent users of the product.  *Id*. at 332-33.  Therefore, Justice Jones

20

recommended abolishing the privity requirement, adopting Section 402A, and thereby allowing product liability actions in tort. *Id*. at 333. He explained that the adoption of Section 402A would protect the consuming public by forcing manufacturers to "stand behind their products," and make the "burden of injuries caused by defects in . . . products fall upon those who make and market the products." *Id*. at 334.

Although the Supreme Court in *Webb* did not expressly recognize a distinct cause of action for bystanders under Section 402A, *Webb* can be read as standing for the proposition that, under Pennsylvania law, there is a distinct cause of action for bystanders under Section 402A.[14] Webb was a bystander who simply had the misfortune of being in the same room as the keg when it exploded. Of course, it is possible that the Court viewed Webb as a user or consumer since he may well have walked into the room to draw beer from the keg. However, the Court did not rely upon any such status in allowing Webb to amend his complaint to include a cause of action under Section 402A, and nothing in the opinion suggests that the Court was concerned with whether Webb was a user of the keg.[15]

---

[14]A caveat to Section 402A states, in relevant part, that the American Law Institute "expresses no opinion as to whether the rules stated in this Section may not apply . . . to harm to persons other that users or consumers."

[15]No further history of the case is available. Accordingly, we do not know what (if any) defenses were asserted on remand, nor do we know the ultimate outcome of the case.

Eight years after *Webb*, the Court decided *Salvador v. Atlantic Steel Boiler Co.*, 319 A.2d 903 (Pa. 1974). There, an employee was severely injured when a steam boiler exploded at his place of work. He brought an assumpsit action against his employer, the retailer of the boiler and its manufacturer. *Id*. at 904. The trial court dismissed the complaint because the employee had not alleged a contractual relationship with the defendants and thus horizontal privity was lacking.[16] *Id*. On appeal, the Pennsylvania Superior Court reversed, and the

---

[16]"Privity of contract is that connection or relationship which exists between two or more contracting parties." *Salvador*, 319 A.2d at 904 n.1. "Vertical privity refers to the relationship between those who are in the distributive chain of a product." Black's Law Dictionary 1200 (6th ed. 1990). "Horizontal privity". . . "is not, in reality, a state of privity but rather one of nonprivity. The term refers to those who are not in the distributive chain of a product but who, nonetheless, use the product and retain a relationship with the purchaser, such as a member of the purchaser's family." *Id*. at 1199.

In *Miller v. Preitz*, *supra*, the Pennsylvania Supreme Court reaffirmed the requirement of vertical privity in an action for breach of warranty in an action for injuries suffered through a breach of warranty. However, *Miller* was overruled by *Kassab v. Central Soya*, 246 A.2d 848 (Pa. 1968), which noted that the adoption of Section 402A in *Webb v. Zern*, *supra*, obliterated any logical basis for retaining the demand for vertical privity. In *Salvador*, the Pennsylvania Supreme Court abolished the requirement for horizontal privity in breach of warranty actions. 319 A.2d at 907-08.

22

Supreme Court subsequently affirmed the reversal.  *Id.*

The Supreme Court noted that its earlier adoption of Section 402A in *Webb* eliminated the necessity of horizontal privity in breach of warranty cases.  The Court explained:

> Today . . . a manufacturer by virtue of section 402A is effectively the guarantor of his product's safety.  Our courts have determined that a manufacturer by marketing and advertising his product impliedly represents that it is safe for its intended use.  We have decided that no current societal interest is served by permitting the manufacturer to place a defective article in the stream of commerce and then to avoid responsibility for damages caused by the defect. He may not preclude an injured plaintiff's recovery by forcing him to prove negligence in the manufacturing process.  Neither may the manufacturer defeat the claim by arguing that the purchaser has no contractual relation to him. Why then should the mere fact that the injured party is not himself the purchaser deny recovery?

23

*Id*. at 907 (citations omitted).

Significantly, although the action was for breach of warranty, the Court focused on the safety of the product rather than the status or the contractual relationship of the parties.[17] It reasoned that because Pennsylvania products liability law "*has progressed,*" the demands of public policy "as well as legal symmetry compel" the conclusion that lack of horizontal privity did not bar the employee's action against the manufacturer for breach of warranty. *Id*. at 907-08 (emphasis added). Essentially, the Court held that relief available in breach of warranty claims should be as broad as that available under Section 402A.

*Salvador* involved an employer-employee relationship, and Section 402A treats an employee as a user of a product. *See* Restatement (Second) of Torts, § 402A, cmt. *l*. However, as in *Webb*, the Court in *Salvador* neither discussed the employee's status nor suggested that his status as an employee was determinative.[18] Rather, the Court

---

[17]It is not clear why the action was brought in assumpsit rather than tort, as § 402A had been the law in Pennsylvania for eight years.

[18] The Superior Court expressly acknowledged the employer-employee context of the dispute. It wrote: "We believe that the injured employee stands in the shoes of his employer and that his cause of action is based on implied warranty and is not barred by the shield of privity. The manufacturers know that most businesses are carried on

24

focused on the safety of the product.[19]

Nevertheless, these Supreme Court cases do not specifically address a bystander's ability to sue under Section 402A. Accordingly, "[w]e give 'due regard' to the decisions of Pennsylvania's intermediate appellate courts as 'indicia of how the state's highest court would decide [the issue].'" *Nowak v. Faberge USA Inc.*, 32 F.3d 755, 759 (3d Cir. 1994) (citation omitted).

The Pennsylvania Superior Court allowed a bystander to sue in strict liability in *Pegg v. General Motors Corp.*, 391 A.2d 1074 (Pa. Super. 1978). Pegg was injured when riding in a car driven by a co-worker. Unbeknownst to Pegg, the co-worker had placed a chemical used to sanitize swimming pools in the car. Pegg was injured when the chemical spontaneously ignited, *id.* at 1077, and he sued the manufacturer of the chemical (among others) under theories

---

through employees who will actually use the product purchased by their employers." *Salvador v. I.H. English of Phila., Inc.*, 307 A.2d 398, 402 (Pa. Super. 1973).

[19]The Berriers contend that a third Supreme Court case, *Kuisis v. Baldwin-Lima-Hamilton Corp.*, 319 A.2d 914 (Pa. 1974), allows bystander recovery under Section 402A. There, an employee sued after being injured by objects falling from a crane at the job site. However, the manufacturer/seller there conceded that Kuisis was a "user" of the crane within the meaning of Section 402A. *Id.* at 919. The case therefore did not involve a "bystander."

25

of negligence and strict liability.  The Pennsylvania Superior Court held that he could recover even in the absence of privity.   The court based liability on whether the manufacturer "place[d] a defective article in the stream of commerce."  *Id*. at 1079 (quoting *Salvador*, 319 A.2d at 970).  Liability did not turn on the relationship between Pegg and the manufacturer.

However, since the Superior Court's decision in *Pegg*, the Supreme Court has issued opinions which appear to limit recovery under Section 402A to intended users.  In *Azzarello v. Black Bros. Co., Inc.*, 391 A.2d 1020 (Pa. 1978), an employee's right hand was injured when it was pinched between two hard rubber rollers in a coating machine owned by her employer.  The employee sued the manufacturer asserting only a cause of action for strict liability under Section 402A, and the manufacturer joined the employer as an additional defendant arguing that the employer's negligence caused the accident in whole or in part.   The trial resulted in a verdict in favor of the manufacturer and the employee moved for a new trial, asserting, *inter alia*, that the trial judge incorrectly instructed the jury that her burden of proof under Section 402A required a showing that the machine was "unreasonably dangerous."  *Id*. at 1022.  On appeal to the Supreme Court, the employee won a new trial.  The Court held that the trial court's use of  "unreasonably dangerous" in the jury instructions had improperly introduced negligence concepts into the proceeding.  *Id.* at 1025.  The erroneous instruction

burdened the injured plaintiff with proof of an element

26

which rings of negligence.  As a result, if, in the view of the trier of fact, the "ordinary consumer" would have expected the defective condition of a product, the seller is not strictly liable, regardless of the expectations of the injured plaintiff . . . .

*Id.* at 1025 (citation and quotation marks omitted).

The Court conceded that limiting liability to defects that are "unreasonably dangerous" "may . . . serve the beneficial purpose of preventing the seller from being treated as the insurer of its products."  *Id*.  (citation omitted).  However, the Court thought that objective could better be achieved by requiring proof of  "a defect in the manufacture or design of the product, and that such defect was a (legal) cause of the injuries." *Id*. (citation omitted) (parentheses in original).

The Court observed:

The development of a sophisticated and complex industrial society with its proliferation of new products and vast changes in the private enterprise system has inspired a change in legal philosophy from the principle of caveat emptor which prevailed in the early nineteenth century market place to the view that a supplier of products should be deemed to be the guarantor of his products' safety.  The realities of our economic society as it exists today forces the conclusion that the risk of loss for injury resulting from defective products should be borne by the suppliers,

principally because they are in a position to absorb the loss by distributing it as a cost of doing business. In an era of giant corporate structures, utilizing the national media to sell their wares, the original concern for an emerging manufacturing industry has given way to the view that it is now the consumer who must be protected.[20]

*Id*. at 1023-24 (citation and internal quotation marks omitted).

The Court explained the evolution of Section 402A and the tension between strict liability and a common law cause of action for negligence. The Court noted that Section 402A initially applied "only to foodstuffs and the requirement was that the food be in a condition dangerous to the consumer." *Id*. at 1025 n.10. However, the present text of Section 402A was substituted for "dangerous" because of concerns "about liability for a product like whiskey, . . . because a jury might find that all whiskey is unreasonably dangerous to the consumer." *Id*. Accordingly, "[t]he word 'defective' was added to ensure that it was understood that something had to be wrong with the product." *Id*. Then, quoting from *Berkebile v. Brantly Helicopter Corp.*, 337 A.2d 893, 902 (Pa. 1975), the Court declared: "[t]he seller must provide the product with every element necessary to make it safe for the intended use." 391 A.2d at 1027. The Court concluded that, "[f]or the term guarantor to have any meaning in this context

_____

[20] Although the Court referred to "the consumer," given the context of that statement, it does not appear that the Court intended to limit that term to "users."

28

the supplier must at least provide a product which is designed to make it safe for the intended use." *Id*. at 1027. However, since a jury could confuse that concept if instructed that the product must be "unreasonably dangerous," the Court agreed that the jury instructions were misleading. *Id.*

The Court also explained that "unreasonably dangerous," has no independent significance, but is a term of art that "merely represent[s] a label to be used where it is determined that the risk of loss should be placed upon the supplier." *Id.* at 1025. Moreover, the determination of whether the risk should be placed upon the supplier was a legal question that must be resolved by a court, not by the fact finder. *Id*. at 1025-26.

Therefore, the appropriate inquiry after *Azzarello* was whether the supplier had designed the product with every element necessary to make it safe for use. *Id*. at 1027. Under that standard, "a jury may find a defect where the product left the supplier's control lacking any element necessary to make it safe for its intended use or possessing any feature that renders it unsafe for the intended use." *Id.* The Court also reaffirmed that the trial court must decide if "the utility of a product outweigh[s] the unavoidable danger it may pose." *Id.* at 1026. Thus "[r]estated, the phrases 'defective condition' and 'unreasonably dangerous' as used in the Restatement formulation are terms of art invoked [by a court] when strict liability is appropriate." *Id.*

It is therefore clear that, after *Azzarello*, strict liability under Section 402A involves a two-prong inquiry. As we

29

explained in *Nowak*:

> Initially, the question of whether a product is defective, given the facts as alleged by the plaintiff, is a question of law to be answered by the trial judge.  If the judge determines as a matter of law that Pennsylvania's social policy supports placing the risk of loss on the manufacturer in the situation alleged by the plaintiff, then the case goes to the jury for a determination as to whether the facts alleged by the plaintiff are true.

32 F.3d at 757 (internal quotation marks and citation omitted).

Although *Azzarello* assists our inquiry, it does not resolve it because it does not tell us the Court's view of *who* the product must be safe for, and that is the primary issue here.  The Court addressed that issue in *Phillips v. Cricket Lighters*, 841 A.2d 1000 (Pa. 2003).  There, a majority of the Supreme Court held that a product must be made safe only for its intended user.

In *Phillips*,  a two-year-old child accidentally started a fire after removing a butane lighter from his mother's purse and setting fire to some linens.  The fire spread throughout the family's apartment, and resulted in the deaths of the two-year old child, his mother, and another minor.  *Id*. at 1002-03.  One child managed to escape through an open window and survived.  *Id*. at 1003.  The administratrix of the decedents'

estates, who was also the guardian of the child who survived, sued the manufacturer and distributor of the lighter, alleging, *inter alia*, strict liability for a defective design under Section 402A, as well as negligent design, because the lighter was not equipped with "childproof features." *Id.* The trial court granted summary judgment to the manufacturer on the Section 402A claim because the manufacturer only intended its lighter to be used by adults, and it was perfectly safe for use by adults.[21] *Id.*

The Superior Court reversed based on its belief that a product must be safe for anyone who uses it.[22] *Id*. at 1004. The Superior Court concluded that Cricket's lighter was defective because it was not equipped with a child safety feature that would have prevented a child from starting a fire. In the Superior Court's view, that defect exposed intended users to grave risk of harm. *Id.* The Supreme Court granted allocatur and reversed because it agreed with the trial court.

_____

[21]The trial court granted the defendants' motion for summary judgment on the negligent-design-defect claim, holding that when a product is found not defective for strict liability purposes, a negligent-design defect must also fail. 841 A.2d at 1003.

[22]As to the negligent-design defect claim, the Superior Court held that since it had found the trial court's decision on the strict liability claim to be error, it had to reverse the entry of summary judgment on the negligent-design defect claim. 841 A.2d at 1004. However, we are not concerned here with such a claim.

31

The majority in *Phillips* began by observing that *Azzarello* "did not answer . . . whether the 'intended use' doctrine necessarily encompasses the requirement that the product need be made safe only for its 'intended user.'" *Id*. at 1005. The majority explained that, although it had never faced that question in a strict liability design defect case, it had faced it in *Mackowick v. Westinghouse Electric Corp.*, 575 A.2d 100 (Pa. 1990), a case alleging strict liability for failure to warn. 841 A.2d at 1005.

In *Mackowick*, an electrician had sued to recover injuries caused by arcing electricity in a high voltage capacitor. He alleged that the capacitor was defective because it did not warn of the dangers of exposed electrical wires. The *Mackowick* Court "rejected that argument . . .[,] reason[ing] that a product need only be made safe for its intended user." *Phillips*, 841 A.2d at 1005 (citing *Mackowick*, 575 A.2d at 102, 103). The "electrical capacitor was intended to be accessed and used only by qualified electricians, and not general members of the public. As experienced electricians are aware of the dangers of live exposed electrical wires, [the *Mackowick* court] concluded that the product was safe for its intended user even absent a [specific] warning." *Id*. at 1005.

In applying the holding of *Mackowick*, the majority in *Phillips* reasoned:

> While *Mackowick* was a failure to warn case, . . . we cannot perceive how it could be confined exclusively to the failure to warn

32

context. *Mackowick* stands for the proposition that a product is not defective so long as it is safe for its intended user. Whether the product is allegedly defective due to a lack of warnings, or because it was ill-conceived, the standard that the product need be made safe only for the intended user appears to be equally applicable.

*Id.*

The administratrix/appellee in *Phillips* argued that the lighter's design was defective because it was reasonably foreseeable that a child might play with it, and therefore the manufacturer should be liable under Section 402A whether the user was the intended adult or the foreseeable child. Although the majority conceded that the argument had "some visceral appeal," it noted that the visceral appeal "has been memorialized in our tort law as a negligence cause of action." *Id.* at 1006.

By the time *Phillips* was decided, the Court had drawn a clear distinction between negligence actions based on notions of foreseeability and a cause of action based on a theory of strict liability. The Court had often declared that "negligence concepts have no place in a case based on strict liability." *Id.* (quoting *Lewis v. Coffing Hoist Div., Duff-Norton Co., Inc.*, 528 A.2d 590, 593 (Pa. 1987)).

Nonetheless, the majority in *Phillips* conceded that even though the Court had "remained steadfast in . . . proclamations that negligence concepts should not be

33

imported into strict liability law, [it had] muddied the waters at times with the careless use of negligence terms in the strict liability arena." *Id.* at 1006-07 (citing *Davis v. Berwind Corp.*, 690 A.2d 186, 190 (Pa. 1997).[23]

The *Phillips* majority sought to clarify the law by clearly stating that a plaintiff bringing a claim for strict liability based on defective design under Section 402A "must [only] establish that the product was unsafe for its *intended* user." *Id.* at 1007 (emphasis added). "We also explicitly state that a manufacturer will not be held strictly liable for failing to design a product that was safe for use by any reasonably foreseeable user, as such a standard would improperly import negligence concepts into strict liability law." *Id.*

The Court reiterated the distinction between negligence concepts and strict products liability in *Pennsylvania Dept. of General Services v. United States Mineral Products Co.*, 898 A.2d 590 (Pa. 2006) ("*Mineral Products*"). There, a fire damaged an office building which used building materials containing polychlorinated biphenyls ("PCBs") manufactured by the defendant. The building housed the offices of several agencies of the Commonwealth of Pennsylvania. Following the fire, the Commonwealth made a decision to demolish the building because of the presence of PCBs, and it was replaced with a new building. The Commonwealth thereafter brought an action against several parties, including the manufacturer

---

[23] In *Davis*, the Court held that a manufacturer could be held strictly liable for subsequent changes that made its product unsafe if those changes were reasonably foreseeable.

34

of the product containing the PCBs, seeking damages for negligence and strict products liability to recover the cost of constructing a new building as well as the loss of personal property contained in the old building. The case went to the jury "solely on a strict liability theory," and the jury returned a verdict against the manufacturer without specification of the particular theories/and or claims that were accepted. *Id.* at 594. The trial court's instruction had "explicitly or implicitly authorized [the jury] to evaluate the evidence to determine whether the fire could be considered to have been a reasonably foreseeable event against which the [manufacturer] should have guarded." *Id*. at 600.

On appeal, the Supreme Court held that the jury instruction was error because Pennsylvania does not recognize a strict products liability cause of action arising from an unintended use even when the unintended use is foreseeable. *Id.* (citing *Phillips*, 841 A.2d at 1007). Accordingly, a "foreseeable misuse of a product [i.e., the fire] will not support a strict liability claim." *Id*. (citing *Phillips*, at 1007). The Court acknowledged that it was "reasonably foreseeable that building materials may be subject to consumption in a fire, and therefore, [there was] an argument that safety . . . should be deemed to encompass . . . the event of . . . combustion." *Id.,* at 601. Notwithstanding the logic of that argument, the Court rejected it because it "contravenes the strong admonition in the lead opinion in *Phillips* . . . to the effect that foreseeability considerations have no place in the setting." *Id.*

For our purposes, it is important to note that in

35

rejecting the trial court's "foreseeability charge," the Court observed: "given the conclusion of [the three concurring Justices in *Phillips*] that there are substantial deficiencies in present strict liability doctrine, it should be closely limited pending an overhaul by the Court." *Id.* (citing *Phillips*, 841 A.2d at 1018 (Saylor, J., concurring)).

In the portion of Justice Saylor's concurring opinion in *Phillips* that is cited in *Mineral Products*, Justice Saylor discussed the tension between "foreseeability" in negligence and strict products liability under Section 402A. He stated: "I BELIEVE, HOWEVER, that the . . . summation of Pennsylvania law demonstrates a *compelling* need for consideration of reasoned alternatives, such as are reflected in the position of the Third Restatement." 841 A.2d at 1018 (upper case in original, italics added). Justice Saylor went on to discuss the application of the Restatement (Third) of Torts at some length. *See id.* at 1019-22.

We believe that Justice Saylor's concurring opinion in *Phillips* foreshadows the Pennsylvania Supreme Court's adoption of §§ 1 and 2 of the Third Restatement's definition of a cause of action for strict products liability.

The Restatement (Third) of Torts provides in relevant part as follows:

> § 1. Liability Of Commercial Seller or Distributor For Harm Caused By Defective Products

36

One engaged in the business of selling or otherwise distributing products who sells or distributes a defective product is subject to liability for harm to persons or property caused by the defect.[24]

Restatement (Third) of Torts: Products Liability, § 1.

Section 2 provides, in relevant part:

§ 2.  Categories Of Product Defect

A product is defective when, at the time of sale or distribution, it contains a manufacturing defect, is defective in design, or is defective because of inadequate instructions or warnings. A product:

(a) contains a manufacturing defect when the product departs from its intended design even though all possible care was exercised in the preparation and marketing of the product;

(b) is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or

---

[24]Under Section 1, "[o]ne engaged in the business of selling or otherwise distributing" applies to "manufacturers." Restatement (Third) of Torts: Products Liability, § 1, cmt. c.

other distributor, or a predecessor in the
commercial chain of distribution, and the
omission of the alternative design renders the
product not reasonably safe;

(c) is defective because of inadequate
instructions or warnings when the foreseeable
risks of harm posed by the product could have
been reduced or avoided by the provision of
reasonable instructions or warnings by the seller
or other distributor, or a predecessor in the
commercial chain of distribution, and the
omission of the instructions or warnings renders
the product not reasonably safe.

Restatement (Third) of Torts: Products Liability, § 2.

As is readily apparent from this text, the Third
Restatement does not limit a strict liability cause of action to
the "user or consumer," and broadly permits any person
harmed by a defective product to recover in strict liability.
*See* Restatement (Third) of Torts: Products Liability, § 1; *see
also* Am. L. Prod. Liab. 3d § 16:56 (2004) ("The drafters thus
appear to be sanctioning claims by all foreseeable persons
affected by a defective product, an interpretation as broad as
that given to the Second Restatement by the courts . . . . The
prevailing view *as to bystander recovery is that the theory of
strict liability in tort may be applied to a mere bystander, as
distinguished from a user or consumer.*") (emphasis added).

The change in the Restatement (Third) of Torts is

consistent with the law in many states, including Wisconsin, California, Mississippi, Arizona, Missouri, Michigan, Iowa, Alabama, Utah, and Vermont.[25]  These jurisdictions allow

---

[25]*See, e.g.*, *Wasik v. Borg*, 423 F.2d 44, 47 (2d Cir. 1970) (Vermont would permit innocent bystanders to recover under § 402A.);  *Beaver v. Howard Miller Clock Co., Inc.*, 852 F. Supp. 631, 635 (W.D. Mich. 1994) ("The Michigan Supreme Court has held that a manufacturer of a product owes a legal obligation of due care to a bystander affected by the use of its product."); *Rivers v. Great Dane Trailers, Inc.*, 816 F. Supp. 1525, 1531 (M.D. Ala. 1993) (noting Florida Supreme Court recognizes that "doctrine of strict liability applies when harm befalls a foreseeable bystander who comes within the range of danger."); *Lovelace v. Astra Trading Corp.*, 439 F. Supp. 753, 760 (S.D. Miss. 1977) (noting "the general consensus therefore appears to favor extension of the strict liability doctrine to provide relief to bystanders."); *Caruth v. Mariani*, 463 P.2d 83, 85 (Ariz. Ct. App. 1970) ("The doctrine of strict tort liability . . . should be available to bystanders as well as to the user or consumer . . . .  All states which have adopted the theory of strict tort liability have extended the theory to the bystander when called upon to do so.");  *Elmore v. American Motors Corp.*, 70 Cal.2d 578, 586 (Cal. 1969) (holding "doctrine [of strict liability] may not be limited on theory that no representation of safety is made to the bystander."); *Haumersen v. Ford Motor Co.*, 257 N.W.2d 7, 16 (Iowa 1977) ("We now bear out the [8th Circuit] Court of Appeals' prediction and extend the doctrine of strict liability to the protection of bystanders."); *Howes v. Deere & Co.*, 201 N.W. 2d 825, 828 (Wis. 1972) (permitting recovery in strict liability

39

bystander liability using the very negligence concepts and foreseeability analysis that the majority opinion in *Phillips* rejected. *See, e.g., Elmore v. American Motors Corp.*, 451 P.2d 84, 89 (Cal. 1969) ("[i]njury to a bystander is often a perfectly foreseeable risk of the maker's enterprise . . . . If anything, bystanders should be entitled to greater protection than the consumer or user where injury to bystanders from the defect is reasonably foreseeable.").

The Third Restatement therefore eliminates much of the confusion that has resulted from attempting to quarantine negligence concepts and insulate them from strict liability claims. As Justice Saylor argues in the heading to Section III of his concurring opinion in *Phillips*: "The Restatement's considered approach illuminates the most viable route to providing essential clarification and remediation." 841 A.2d at 1019.

> [T]he [Third] Restatement's conception of defective design is more nuanced, to accommodate the wider range of scenarios that

for bystander injured by riding mower. "There is no essential difference between injured user or consumer and the injured bystander."); *Giberson v. Ford Motor Co.*, 504 S.W.2d 8, 12 (Mo. 1974) ("We extend any rights flowing from the rule of strict liability in tort . . . to include a bystander."); *Straub v. Fisher & Paykel Health Care*, 990 P.2d 384, 390 (Utah 1999) ("Manufacturers and sellers are strictly liable for the usual, foreseeable consequences of the risks presented by the defects in their products.")

40

may face injured consumers and manufacturers/suppliers. As a general rule, a product is deemed defective in design when the foreseeable risks could have been reduced or avoided by the use of a reasonable alternative design, and when the failure to utilize such a design has caused the product to be not "reasonably safe."

*Id.* (citing Restatement (Third) of Torts: Products Liability § 2(b)).

Justice Saylor criticized the *Phillips* majority's ritualistic approach to products liability as follows:

the lead Justices retrench the Court's periodic admonishment to the effect that negligence concepts have no place in a strict liability action. A decided majority of courts and commentators, however, have come to recognize that this proposition cannot be justly sustained in theory in relation to strict products liability cases predicated on defective design; moreover, it is demonstrably incongruent with design-defect strict liability doctrine as it is currently implemented in Pennsylvania trial courts and in federal district courts applying Pennsylvania law. Furthermore, while the parties to the litigation underlying this appeal may not have expressly developed the approach of the products liability segment of the Third

41

Restatement . . ., the Restatement position represents a synthesis of law derived from reasoned, mainstream, modern consensus. Particularly in view of pervasive ambiguities and inconsistencies in prevailing Pennsylvania jurisprudence in this area, I view this appeal as an opportunity to examine the range of readily accessible, corrective measures. In my judgment, the Restatement's considered approach illuminates the most viable route to providing essential clarification and remediation, at least on a prospective basis. Ultimately, I join the majority disposition on the strict liability and negligence claims under present law.

841 A.2d at 1012.

Our examination of appellate decisions in Pennsylvania that have discussed products liability convinces us that Justice Saylor was correct in recognizing that "[c]entral conceptions borrowed from negligence theory are embedded in strict products liability doctrine in Pennsylvania." *Id*. In fact, Justice Saylor went so far as to criticize the *Phillips'* majority's "adherence to the position that negligence concepts have no place in strict liability" as a "common aphorism in the developmental stages of strict liability doctrine . . . ." *Id*. at 1014-15. As noted earlier, the majority drew that distinction based upon its view that negligence focused on the conduct of the manufacturer whereas products liability focused on the product. However,

42

Justice Saylor pointed out: "most courts and commentators have come to realize that in design cases the character of the product and the conduct of the manufacturer are largely inseparable." *Id*. at 1015.[26]

Justice Saylor also noted that "the term 'defective' gives an illusion of certainty" because it suggests a specific meaning "rather than a term connoting a standard involving the weighing of factors." *Id*. at 1018 (citation omitted). We agree that it is difficult (if not impossible) in practice to determine if a product is safe for an intended use by an intended user without any consideration of foreseeability. *Id*. Accordingly, as Justice Saylor believed, "integration of the 'reasonably foreseeable use' alternative into strict products liability doctrine may reflect the greater consensus and better reasoned view, in the landscape of our law as it presently exists . . . ." *Id*.[27] The result achieved from the approach of

---

[26] Indeed, Justice Saylor recognized that it is the manufacturer who designs the product. It is therefore exceedingly difficult to ignore the manufacturer's conduct and focus only on the design that resulted from it.

[27]Despite the admonitions in *Phillips* and *Mineral Products* that liability under Section 402A is focused on intended users and intended uses and that negligence and foreseeability concepts have no place under strict products liability law, the decisions of the Pennsylvania Superior Court continue to struggle with the harsh consequences that the "intended user doctrine" can sometimes have. *See, e.g., Kiak v. Crown Equipment Corp.*, __ A.2d __, 2009 WL 377166 (Pa. Super.

43

the Third Restatement is consistent with the modern trend of

---

Feb. 17, 2009) (employee/non-user of forklift injured by co-worker operating the forklift permitted to proceed against manufacturer of forklift under Section 402A); *Schmidt v. Boardman Co.*, 958 A.2d 498 (Pa. Super. 2008) (bystanders who witnessed relatives killed and/or injured by defective product allowed to recover under Section 402A for emotional distress even though they suffered no physical injuries).

However, in *Bogush v. Allen Refractories Co.*, 932 A.2d 901, 910 (Pa. Super. 2007), the Superior Court refused to grant a new trial to a supplier of asbestos products based on the supplier's argument that that trial court erred in failing to apply the Restatement (Third) of Torts, § 2, instead of Section 402A, to plaintiff's strict liability claim. The supplier argued that it was entitled to a new trial because a miscarriage of justice had occurred when the trial court applied Section 402A rather than the reasoning of Justice Saylor's concurrence in *Phillips*. *Id.* The Superior Court refused to adopt the reasoning of the concurrence in *Phillips*, stating that "[u]nless and until our Supreme Court alters its approach to strict liability, we will continue to adhere to established principles." *Id.*

The supplier filed a petition for allowance of appeal with the Pennsylvania Supreme Court, which granted the petition on February 27, 2008. *Bugosh v. I.U. North America, Inc.*, 942 A.2d 897 (Pa. 2008) (per curiam). The Pennsylvania Supreme Court framed the issue as follows: "Whether this Court should apply § 2 of the Restatement (Third) of Torts in place of § 402A of the Restatement (Second) of Torts."

44

law as well as the evolving policy considerations discussed in *Webb* that lead to the adoption of the Section 402A in the first place.

Justice Saylor authored the Court's majority opinion in *Mineral Products*. There, he was joined by now Chief Justice Castille, and Justices Nigro and Eakin, as well as then Chief Justice Cappy. Justice Newman wrote a concurring and dissenting opinion that was joined by Justice Baer. In Section II of his majority opinion, Justice Saylor discussed the plaintiff's strict liability claim. He noted that, although "it is reasonably foreseeable that building materials may be [consumed] by fire," and therefore building materials that cause damage when burned could be deemed defective, that "argument contravenes the strong admonition in the lead opinion in *Phillips*. . . to the effect that foreseeability considerations have no place in [strict liability]." 898 A.2d at 601.

Justice Newman dissented from Justice Saylor's discussion of strict liability in *Mineral Products*. Joined by Justice Baer, Justice Newman stressed that *Phillips* should not have governed the analysis in *Mineral Products* because "there was no Majority [in *Phillips*] to conclude that foreseeability considerations **never** have a place in a strict liability case. Instead, the overriding principle set forth in *Phillips* is that strict liability should be limited to a very small range of cases . . . [and] cases involving an unintended user [i.e., *Phillips*] are outside the scope of the strict liability doctrine." *Id*. at 615. (emphasis in original). She further explained:

45

As in *Phillips,* an argument concerning the Third Restatement of Torts is not before us. I recognize the apparent and possible appeal in the more progressive approach adopted by the Third Restatement, in particular, in cases such as this involving a known dangerous chemical where a risk-utility test would be a just measure of a manufacturer's liability for the product. However, I will proceed to analyze the present matter pursuant to our existing caselaw and the Second Restatement of Torts.

*Id.* at 616 n. 2.

Thus, it is clear from the discussions of Justice Saylor in *Phillips* and Justice Newman in *Mineral Products* that there is substantial support on the Court to adopt the Third Restatement's approach to product liability in an appropriate case.[28] We believe that this is such a case.

---

[28]*Phillips* was decided by six Justices. We view the relevant portion of the opinion as a two-justice majority because then Chief Justice Cappy authored the decision, but only Justice Newman expressly joined the portion of the opinion which held that the strict liability claim must fail because the lighter was not unsafe when used by adults, and that concepts of negligence have no place in strict products liability cases. *Phillips*, 841 A.2d at 1023. Justice Saylor filed a concurring opinion joined by Justices Castille and Eakin. *Id.* at 1012 (Saylor, J., concurring). Justice Newman filed a concurring and dissenting opinion which expressed her

The unintended user doctrine is not implicated by Berrier's claim. Accordingly, there is little logic and much sophistry in reflexively applying cases discussing intended uses and users to determine liability for defective design under the circumstances here. *See Aetna Life & Cas. Co. v. Barthelemy* 33 F.3d 189, 193 (3d Cir. 1994) ("Where stops the reason, there stops the rule.").

District courts in Pennsylvania have no doubt recognized that lack of logic and abundance of sophistry because they have allowed bystanders to recover in strict products liability under Section 402A under Pennsylvania law just as Justice Saylor explained in *Phillips*.[29] Even though

---

support of Chief Justice Cappy's opinion, as well as her disagreement that the negligence causes of action should be permitted to go forward. *Id.* at 1023 (Newman, J., concurring and dissenting). Justice Nigro concurred in the result, but did not write separately or join either concurrence. *See id.* at 1012. Justice Zappala did not participate in the decision. *Id.* at 1011.

Although Justice Newman is no longer on the Pennsylvania Supreme Court, Justice Baer remains. The fact that he joined Justice Newman's opinion means that four of the current seven Justices have voiced support for adopting the Third Restatement.

[29]*See, e.g., Fedorchick v. Massey-Ferguson, Inc.*, 438 F. Supp. 60, 62-63 (E.D. Pa. 1997), *aff'd*, 577 F.2d 725 (3d Cir.

47

those cases were decided before *Phillips* and *Mineral Products,* we do not believe that the result in those cases is altered by the Court's subsequent decisions because, as Justice Newman explained in *Mineral Products*, *Phillips* is a narrow holding that only addresses "unintended users," and *Mineral Products* did not involve bystanders at all.

Moreover, we implicitly recognized the right of bystanders to recover in strict products liability under Pennsylvania law in *Parks v. AlliedSignal, Inc.*, 113 F.3d 1327 (3d Cir. 1997), and *Surace v. Caterpillar, Inc.*, 111 F.3d 1039 (3d Cir. 1997). We decided those cases within two

1978) (Table) ("[Section] 402A provides coverage for a person who suffers harm proximately caused by a defective and unreasonably dangerous product, regardless of whether that person used or consumed the product."); *see also Stratos v. Suer Sagless Corp.*, 1994 WL 709375 at \*5 (E.D. Pa. December 21, 1994) (permitting administrator of seventeen month old daughter's estate to bring strict liability claim against manufacturer of allegedly defective bed even though the decedent was "non-user of the product who wandered into the product's danger zone"); *Herman v. Welland Chemical, Ltd.*, 580 F. Supp. 823, 829 (M.D. Pa. 1984) (volunteer fireman struck by car while directing traffic following chemical spill on highway permitted to bring Section 402A claim). *But see Van Buskirk v. West Bend Co.*, 100 F. Supp.2d 281, 285 (E.D. Pa. 1999) (guardians of child burned by an allegedly defective fryer denied recovery on a strict liability theory, in part, because the child was "not an intended user" of the fryer).

48

months of each other, but before the Pennsylvania Supreme Court's decisions in *Phillips* and *Mineral Products*. *Parks* and *Surace* nevertheless demonstrate the difficulties of employing a rigid bar to preclude bystander recovery under Section 402A.

In *Parks*, the manufacturer of an excavating machine was sued by the spouse of an employee who was killed when he was struck by a counterweight attached to the machine's excavating arm. The spouse claimed that the design of the machine was defective because it did not provide sufficient visibility for the operator to see her husband. The jury returned a verdict in favor of the manufacturer, and plaintiff appealed arguing, *inter alia*, that the district court had erred in instructing the jury about contributory negligence and causation. The jury had concluded that the design of the machine was defective but "presumably" based its verdict on a finding that "the defect was not 'a substantial factor' causing the death." 113 F.3d at 1330.[30]

We reversed because the jury charge did not explain that the decedent's own conduct could only have been the "'legal cause of the accident' if [that conduct] was . . . extraordinary or unforeseeable." 113 F.3d at 1337. We

---

[30] The argument was actually phrased in terms of causation. Appellant argued that the court should have instructed the jury that "if [her husband's] conduct were foreseeable, such conduct could not have broken any chain of causation linking the alleged defect to his death." 113 F.3d at 1330.

reached that conclusion based on "[t]he centrality of foreseeability to Pennsylvania's strict products liability law. . . ." *Id.*

Thus, as we said in *Parks*,  the "manufacturer [was] . . . responsible for making the product safe for all foreseeable uses." 113 F.3d at 1332.

The facts in *Surace v. Caterpillar, Inc.*, 111 F.3d 1039 (3d Cir. 1997), are very similar to the facts before us here. There, a construction worker was injured when his foot was run over by  paving equipment.  He brought an action for damages under Section 402A, alleging that the machine's design was defective because it did not prevent the machine from operating in reverse unless activated by someone on the ground.  The district court granted summary judgment to the manufacturer.

On appeal, we held that the district court erred by not first performing a risk utility analysis as required by *Azzarello*, and we suggested that  the "multi-factor list developed by Dean John Wade [could] be employed in doing so." 111 F.3d at 1042 (citing John Wade, *On the Nature of Strict Tort Liability for Products,* 44 Miss.L.J. 825, 837-38 (1973)).[31]  As we suggested earlier, our remand to allow the

---

[31] The "Wade factors" for conducting a risk utility analysis are:
(1) The usefulness and desirability of the product . . . to the user and to the public as a whole; (2) The . . . likelihood that it will cause injury, and the probable seriousness of the injury; (3) The

50

trial court to conduct a risk utility analysis implicitly recognized the right of the plaintiff/bystander to recover under Section 402A. We did so while stressing that "the Pennsylvania Supreme Court eschews the use of negligence concepts in a strict liability case." 111 F.3d at 1050 (citing *Lewis v. Coffing Hoist Div., Duff-Norton Co.*, 528 A.2d 590, 593 (Pa. 1987) and *Kimco Dev. Corp. v. Michael D's Carpet*, 637 A.2d 603, 606 (Pa. 1993)).

Our discussion in *Surace* included an example suggested by Dean Wade:

> [T]he dangers of a hoe or an axe are both matters of common knowledge and fully apparent to the user. But it is not necessarily sufficient to render a product duly safe that its dangers are obvious, especially if the dangerous condition could have been eliminated. A rotary lawn mower, for example, which had no housing to protect a user from the whirling

---

availability of a substitute product which would meet the same need and . . . be [safe]; (4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive . . . ; (5) The user's ability to avoid danger by the exercise of care . . . ; (6) The user's anticipated awareness of the dangers inherent in the product and their avoidability. . . ; and (7) The feasibility, on the part of the manufacturer, of spreading the loss [or] setting the price of the product or carrying liability insurance. 111 F.3d at 1046 (citations omitted).

blade[,] would not be treated as duly safe,
despite the obvious character of the danger.

111 F.3d at 1052 (quoting Wade, *supra* at 842-43) (brackets in original).

We agree, and we do not think anything that the Court has since held is to the contrary.  Nor do we think the policy behind strict products liability is served by declaring that the design of Dean Wade's hypothetical mower is only defective if the spinning blade injures the user.  Yet, that is the result of artificially restricting strict products liability to "intended users" based upon concerns of contaminating a strict liability claim with considerations of foreseeability.   We believe that the same policy demands that were first articulated in *Webb* require placing the risk of loss on the manufacturer whether the person injured by Dean Wade's hypothetical mower is operating the mower or standing near it.

Similarly, we find nothing in Pennsylvania law to suggest that the Supreme Court would deny recovery under a strict liability theory to spectators at a sporting event who are injured by an airplane that crashes into the stadium because a wing was defectively designed.  We do not think the policy considerations that have been recognized since *Webb* would allow strict liability claims to the passengers but deny it to the spectators simply because they happened to be underneath the falling debris and not inside of it.  Sections 1 and 2 of the

52

Third Restatement avoid such illogical results.[32]  Section 2 of the Third Restatement takes a "more progressive view," and far more realistic approach to strict liability when "bystanders" are involved.

We therefore conclude, as Justice Saylor proclaimed in *Phillips*,  that "the time has come for this Court . . . to expressly recognize the essential role of risk-utility balancing, a concept derived from negligence doctrine, in design defect litigation."  841 A.2d at 1015-16 (Saylor, J., concurring). Justice Saylor has recognized that "[the] Commonwealth's products liability litigation jurisprudence is far too confusing for another opinion to be laid down that rhetorically eschews negligence concepts in the strict liability arena, while the Court nevertheless continues to abide and/or endorse their actual use in the liability assessment." *Id*. at 1016.

This case would allow the Supreme Court an

---

[32] Yet another hypothetical further illustrates the point.  If a car manufacturer's design resulted in a car with a passenger compartment impervious to the force of any impact, but which caused the wheels to fly off when the car approached 20 mph, pedestrians struck by the wheel should certainly be able to argue that the design was defective (and not merely negligent). It is incomprehensible to us that the policy considerations underlying products liability law in Pennsylvania would preclude such a suit merely because the pedestrian/plaintiff was a "bystander" and not an occupant/user of the car.

opportunity to acknowledge that the Third Restatement "represents a synthesis of law derived from reasoned, mainstream, modern consensus." *Id*. at 1012 (Saylor, J. concurring). We believe that, if addressing this issue, a majority of the Supreme Court would agree that "the [Third] Restatement's considered approach illuminates the most viable route to providing essential clarification and remediation, at least on a prospective basis." *Id*.

We realize that Justice Saylor's comments focused on Section 2(b) of the Third Restatement of Torts, and that section only addresses *when* a product is defectively designed. *Id*. at 1019-1021. As we explained earlier, the issue here involves *who* the manufacturer is liable to because of a defectively designed product. That question is addressed in section 1 of the Third Restatement, not section 2.

The concurring opinion in *Phillips* did not discuss Section 1. However, Justice Saylor did recognize that Section 2(b), the section describing when a product is defective, is "generally a negligence standard," *id*. at 1020, and he ostensibly recognized that integrating negligence principles into a strict liability design defect claim, including the replacement of the intended user doctrine with a "reasonably foreseeable use" standard, "may reflect the greater consensus and better reasoned view." *Id*. at 1018. We think it highly likely that the Justices who would adopt section 2 would adopt as well as section 1 rather than trying to parse the applicable provisions of the Third Restatement and thereby supplant some of the provisions of the Second Restatement

54

and not others.[33]

We therefore hold that the district court should not have relied on the "intended user" doctrine in granting summary judgment to Simplicity on the Berriers' claim for strict products liability based on the allegedly defective design of Simplicity's lawn mower.  We will therefore vacate on that claim and remand for proceedings consistent with this opinion.[34]

---

[33]  On January 17, 2008, pursuant to Third Circuit LAR MISC. 110 and Internal Operating Procedure 10.9, this panel certified the following question to the Pennsylvania Supreme Court:

> Whether, under Pennsylvania law a plaintiff minor child may pursue a strict liability claim for injuries caused by a riding lawnmower, where the child is neither an intended user nor consumer of the mower.

However, on October 17, 2008, the Pennsylvania Supreme Court entered an order respectfully declining the panel's petition for certification.

[34]As noted in the concurrence in *Phillips*, Section 2(b) of the Third Restatement "roundly endorses a reasonableness-based, risk-utility balancing test as the standard for adjudging the defectiveness of product designs."  841 A.2d  at 1020 (Saylor, J., concurring) (citation omitted).

55

## B. Negligence.

The district court also held that the Berriers' negligent design claim failed as a matter of law because "Simplicity did not owe a duty to Ashley to design the mower in accordance with plaintiffs' proposed safety features." 413 F. Supp.2d at 444. The court also rejected the claim because the Berriers did not present any evidence "to indicate that the design of the instant mower with additional so-called 'safety' features would actually increase the safety of the mower without impairing its social utility." *Id*. at 449. The Berriers claim that both rulings were erroneous.

To prevail in a negligence action, a plaintiff "must show that the defendant had a duty to conform to a certain standard of conduct, that the defendant breached that duty, that such breach caused the injury in question, and actual loss or damage." *Phillips*, 841 A.2d at 1008 (citation and quotation marks omitted). Whether a defendant owes a duty of care to a plaintiff is a question of law in Pennsylvania. *Kleinknecht v. Gettysburg College*, 989 F.2d 1360, 1366 (3d Cir. 1993).

We agree with the Berriers that the court erred in ruling that Simplicity did not owe a duty to Ashley. In resolving that question at the summary judgment stage, the court should have viewed the record in the light most favorable to the Berriers - the non-moving parties. *See Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir. 2007); *see also* Fed.R.Civ.P. 56(c).

56

In Pennsylvania, the determination of whether a duty of care is owed is a policy decision that requires the trial court to apply the "*Althaus* test."  That inquiry requires that the court consider: "(1) the relationship between the parties; (2) the social utility of the [defendant's] conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the [defendant]; and (5) the overall public interest in the proposed solution." *Phillips*, 841 A.2d at 1008 (quoting *Althaus v. Cohen*, 756 A.2d 1166, 1169 (Pa. 2000) (quotation marks omitted)).[35]

Although these factors guide the court's inquiry "[i]n determining the existence of a duty of care, it must be remembered that the concept of duty amounts to no more than the sum total of those considerations of policy which led the law to say that the particular plaintiff is entitled to protection from the harm suffered." *Althaus*, 756 A.2d at 1168-69 (citation and internal quotation omitted).  "Thus, the legal concept of duty of care is necessarily rooted in often amorphous public policy considerations, which may include our perception of history, morals, justice and society." *Id.* at 1169.   Because the question of whether a defendant owes a plaintiff a duty of care is a question of law, *Kleinknecht v. Gettysburg College*, 989 F.2d at 1366, we have plenary review of the district court's determination that Simplicity did not owe Ashley a duty of care. *See American Society for Testing & Materials v. Corrpro Companies, Inc.*, 478 F.3d 557, 566 (3d Cir. 2007) ("[w]e have plenary review over a

---

[35] This inquiry is very similar to the inquiry suggested by the "Wade factors." *See* n.31, *supra*.

district court's conclusions of law") (citation omitted).   1. Relationship Between the Parties

We believe that the relationship between Ashley and Simplicity is, at best, uncertain because Ashley did not purchase the mower.  It must be remembered that the relationship between the parties in *Phillips* weighed against a duty.  Although there was a relationship there between the mother/purchaser and the manufacturers, the relationship between the defendant lighter manufacturers and the children who died in the fire was "less certain." *Phillips*, 841 A.2d at 1009.   We therefore agree with the district court that this factor weighs against the existence of an underlying duty to Ashley.   However, it must also be remembered that "[n]o one of these five factors is dispositive.  Rather, [a duty] will be found to exist where the balance of these factors weighs in favor of placing such a burden on a defendant." *Id.* at 1008-09.  We believe each of the remaining factors weighs in favor of finding that Simplicity owed Ashley a duty of care.

## 2. Social Utility of Defendant's Conduct

The district court's analysis of the social utility of the mower included the following three findings: (1) a riding mower that cannot mow in reverse lacks social utility, (2) Plaintiffs failed to present evidence indicating that an NMIR device that shuts down the mower if an operator engages the mower blades while operating in reverse would increase the product's safety; and (3) the additional safety mechanisms identified by Plaintiffs, including roller barriers and an NMIR device with an override feature, do not actually improve

58

safety by decreasing back-over injuries. 413 F. Supp.2d at 444-46. However, those findings are inconsistent with the record.

The district court reasoned that "operators frequently need to cut grass in reverse . To deny operators the capacity to perform these basic maneuvers, with the mower deck engaged, would add significant time and frustration to the lawn-mowing task." *Berrier*, 413 F. Supp. at 444. That conclusion overlooks testimony by the defendant's own expert who testified that "there is *rarely* any reason to mow in reverse." App. 758. That expert explained that:

> nearly all of the reverse operations on these machines are just for maneuvering. I have seen situations where it's – would be easy to understand why somebody would want to mow in reverse when they have a very narrow corridor and there is no room to turn around at the end and two cutting widths will cut that grass. But those kind of geometric situations are kind of unusual.[36]

App. 758.

The court's consideration of this factor also overlooks the undisputed fact that, between 1982 and 1992, five leading

---

[36] Similarly, Ashley's grandfather put the mower in reverse in order to turn the mower around. He was not attempting to mow in reverse. App. 126.

59

riding mower manufacturers sold nearly two million units which prevented the operator from mowing in reverse by incorporating the MTD device. App. 557-58.

Second, the Berriers proffered sufficient evidence to establish that the mower in question was safer when equipped with the NMIR device. Their expert reported that, out of the two million mower units just mentioned, none generated any reports of a back-over blade accident. App. 558.

It is important to clarify that two NMIR devices are relevant to our inquiry: the MTD Device"— used by MTD in two million of its mowers when Shoff's mower was manufactured, and the "Override Device." We consider the social utility of each in turn.

### a. NMIR

The district court concluded that the MTD device lacked social utility because it shuts down the mower's engine when operated in reverse, but allows the mower to backup for at least 4.5 feet before the engine shuts off. 413 F. Supp. 2d at 444. This blade interlock device is the device that the CPSC refused to require as an industry standard because of efficacy concerns. App. 391. The CPSC found that such a device would likely be disabled by the operator out of frustration. *Id.* at 473. Moreover, the group stated it did not have sufficient data on how many deaths or injuries would be prevented by a NMIR feature because there was no data on how fast the blade would have to stop to significantly reduce injuries, or the extent to which children would be injured by

60

being backed over after the blade stopped.  App. 472.

The district court was also unpersuaded by the Berriers' evidence of the lack of injuries caused by suitably equipped MTD mowers.  It cited evidence of four back-over accidents involving MTD mowers—which appears to contradict the Berriers' evidence that the MTD device completely eliminated all back-over accidents.  413 F. Supp.2d at 445.

The Berriers point out, however, that all of these incidents occurred when the operator disabled the NMIR device.[37]  App. 761-63.  Berriers' counsel informed the court of Simplicity's admission of this fact during oral argument. The trial court was apparently not persuaded.  However, we believe that is a relevant consideration, particularly because this is consistent with the statement made by Gunter Plamper, MTD's Vice President for Product Development and Safety. He testified about the effectiveness of the device as follows:

> The no-mow-in-reverse feature will shut off mower blades if an operator shifts into reverse without first disengaging the mower blades. This safety feature has successfully prevented back-over accidents.  Neither MTD, Cub Cadet, Yard-Man, White Out Door or MTD Yard

---

[37] This fact is disputed.  Berrier claims that all four incidents occurred when the NMIR was disabled.  Simplicity maintains that only two of the four incidents involved disabled NMIR devices.  *See* Simplicity's Br. at 45-46.

> Machines have had any reported back-over
> accidents on one of their riding mowers when
> the safety features were *in place and
> functioning* as designed.

App. 581 (emphasis added).

The district court believed the fact that the device could be disabled negated any safety advantage of the design.[38] 413 F. Supp.2d at 445. The court relied in part on a study from the 1980's that confirmed that at least 40 percent of operators disabled NMIR features on their mowers. 413 F. Supp. at 445 n.8. However, that statistic also means that the majority (60%) of people operating these mowers did not disable the feature. Accordingly, we believe that the record establishes that the feature could have a significant impact on

---

[38] This conclusion is in tension with the current industry practice of including back-over protection on riding mowers. If the protection was ineffective, and lacked any social utility, as the district court concluded, it is difficult to understand why other companies would incorporate this feature. Manufactures that added NMIR devices (though it is not clear what kind–override or the MTD original) included Toro in 1999, John Deere, Snapper and Kubota. App. 314. The only logical reason for including an NMIR device on a riding mower was stated by the CPSC: mowers that contain an NMIR device are safer than those without one. App. 576.

reducing the risk of injury from back-over accidents.[39] The determination of whether a product was negligently designed turns on whether "an alternative, *feasible*, safer design would have lessened or eliminated the injury plaintiff suffered." *Habecker v. Clark Equipment Co.*, 36 F.3d 278, 281 (3d Cir. 1994) (quotations marks and citation omitted) (emphasis in original). The Berriers presented evidence that the NMIR device without the override would have at least lessened the likelihood of Ashley's injury and may have eliminated it.

### b. Override Device

The district court dismissed the efficacy of an override device because it viewed such a device as equivalent to a design which allowed the operator to choose whether to engage the blades or not ("mow in reverse"). 413 F. Supp. 2d at 446. However, the difference is significant because an override switch requires an extra step before being able to

---

[39] The district court was also troubled by the fact that the Berriers' expert had not personally conducted studies on the rate at which NMIR systems are disabled. More importantly, the expert had not conducted any statistical analysis to determine the rate of back-over blade injuries between mowers with NMIR features and those without such features; or the rate of back-over blade injuries for mowers with a disabled NMIR feature. 413 F. Supp.2d at 445. However, at the summary judgment stage, the court is not entitled to weigh the evidence; that is solely the task of the fact-finder. Rather, the court must limit its inquiry to whether a genuine issue of fact exists.

mow in reverse. In theory, the operator can not backup without thinking; the default position disengages the blades when the mower is put into reverse. *See* App. 580. On those rare occasions when it is necessary to mow while backing up, the extra step reminds the operator to check behind the mower before pressing the override button. We realize that the Berriers' expert did not provide any data to show mowers with this design had fewer back-over injuries. However, ANSI's adoption of the requirement in 2003 certainly suggests that mowers with this design are safer.

The district court was ultimately unconvinced by Berrier's argument. 413 F. Supp. 2d at 446 ("[T]his Court fails to see how a "no mow in reverse device" with an override would prevent future back-over accidents . . . .").[40] However, the very fact that the ANSI standard has required NMIR devices on riding mowers since 2003 undermines the district court's conclusion that NMIR devices do not increase safety. That is particularly true since the court relied so heavily on the CPSC's initial refusal to require the MTD device (with no override feature).

Moreover, though the CPSC did not promulgate regulations requiring NMIR devices when Shoff's mower was manufactured, the CPSC did acknowledge that riding mowers with an NMIR feature are safer than those without one. App.

---

[40]The Berriers characterize the trial court's determination that the safety devices they proposed were ineffective (and presumably could not have prevented this accident) as a judicial determination of "no causation."

64

576. That, together with the Commission's later adoption of the device with an override feature (presumably, that device addressed the Commission's earlier concerns) supports the Berriers' argument that an alternative design could have prevented Ashley's injury and that Simplicity therefore had a duty to adopt it. We therefore believe that the district court's conclusion that an NMIR with an override feature was not a feasible and safer design is directly contradicted by the industry's decision to promulgate standards requiring such devices and the subsequent compliance with this requirement.

### c. Roller Devices

The district court committed a similar error in concluding that there was no genuine issue of material fact about whether roller barriers "would actually improve safety by decreasing back-over injuries." 413 F. Supp.2d at 446. In reaching that conclusion, the court appears to have ignored evidence that Simplicity believed so strongly in the effectiveness of roller barriers that the company requested that feature be considered as an acceptable alternative to the NMIR device requirements in the ANSI 2003 standards. App. 597-98. Moreover, Simplicity admitted that "rollers may provide some protection against accidents and injuries" in its responses to interrogatories. App. 151.

In reaching its conclusion to the contrary, the district court focused on the Berriers' expert's refusal to testify that the use of roller guards would make the mower "reasonably safe" in part because he lacked information "on the performance of rollers in preventing child back-over blade

65

contact accidents." 413 F. Supp. 2d at 446. However, when discussing Ashley's specific injury, E. Reed Smith, P.E., the Berriers' expert, confirmed in his report that rollers are effective in pushing small children backwards and out of the way of the spinning blades. App. 553-54. There is also evidence of a 1997 study by Reed confirming the effectiveness of the roller barrier. App. 519, 593-94. Reed's report also further stated that if the subject mower had a set of "full-width ground-contacting rollers at the rear edge of the mower deck, given the distance Mr. Shoff backed up on the day of the accident, it is unlikely Ashley would have suffered the amputation injury she did." Reed therefore concluded that the lack of rollers "was a cause of Ashley Berrier's foot amputation injuries." App. 560.

As previously noted, Simplicity makes much of the fact that Reed testified that roller blades alone would not make the mower reasonably safe. However, that is a legal conclusion. Moreover, it misstates the applicable legal standard. That standard is whether the design "would have lessened or eliminated the injury plaintiff suffered." *Habecker*, 36 F.3d at 281 (citation and quotation marks omitted). Reed testified that "rollers in this particular situation would have prevented this accident." App. 302.

The district court also appears to have ignored statements of Simplicity's own lead designer, who stated: "we think that the potential for a full roller to offer some protection in some circumstances for – that certainly doesn't hurt the – the propensity for blade contact and it may offer some protection." App. 518. Another Simplicity engineer

66

testified that the roller barrier provided back-over protection and reduced injuries. App. 593-96. Furthermore, as previously noted, Simplicity was so confident about the effectiveness of the roller barrier that it asked the OPEI to consider the roller barrier on Simplicity products as "an acceptable barrier" in lieu of an NMIR device in the 2003 ANSI standard, which now requires back-over protection. App. 597-98.

Accordingly, after viewing the evidence in the light most favorable to the Berriers, we believe that the district court erred in concluding that the social utility factor weighed against finding that Simplicity owed a duty to the Plaintiffs.

### 3. Nature of the Risk and Foreseeability of Harm

The third prong of the duty inquiry balances social utility of a design against the extent and foreseeability of the harm that would result in its absence. *Althaus*, 756 A.2d at 1170. "A duty arises only when one engages in conduct which foreseeably creates an unreasonable risk of harm to others." *R. W. v. Manzek*, 888 A.2d 740, 747 (Pa. 2005).

Here, the Berriers produced evidence that the risk of back-over blade contact injuries exists and that this risk was foreseeable when Shoff's mower was manufactured; and the district court conceded as much. *Berrier*, 413 F. Supp. at 447. The Berriers' expert testified that, based on studies published between 1981 and 1993, one riding mower per 5,000 to 6,000 produced is involved in a back-over blade accident at some point. *Id.* However, the district court concluded that this

67

weighed only marginally in favor of finding a duty of care because the CPSC had not found the risk of injury sufficiently significant to promulgate a final regulation mandating or recommending the addition of NMIR devices. *Id.*

The Berriers correctly point out that the district court focused on CPSC's decision not to promulgate regulations. However, as both parties acknowledge, that decision was based on the efficacy of mowers with NMIR devices. It was not based on the nature of the risk and foreseeability of harm. The CPSC and others realized that risk after a series of studies in the 1970's and 80's. App. 544-50. Those studies characterized back-over blade accidents as the most tragic type of lawnmower accidents, comprising between nine and 11 percent of reported accidents involving riding mowers. App. 721. The Berriers' expert testified that more than 100 hospitalizations per year take place because of back-over blade contact incidents. App. 735. Moreover, as Ashley's tragic injury demonstrates, the injuries that do result can be quite serious. Indeed, the injuries are potentially fatal in the absence of prompt medical attention and expert treatment that may not be available everywhere riding mowers are used.

The district court acknowledged the raw data in these studies but concluded that CPSC's hesitation in promulgating NMIR requirements (despite its awareness of the studies) undermined the significance of those statistics. In doing so, the court cited the CSPC's statement that it lacked "sufficient information to determine how many deaths or injuries would be prevented by [a no-mow-in-reverse] feature." 413 F. Supp.2d at 447 (quoting CPSC Letter dated July 19, 1993

68

(App. 472)) (internal quotation marks omitted).

However, CSPC's decision was not based on the low risk of accident. Rather, the CSPC did not act because standards were already "being actively pursued by the industry," and the CSPC concluded that "there is usually a high degree of conformance to this type of voluntary standard." App. 577.

Simplicity maintains that CPSC's decision not to require anti-back-over devices is consistent with the statistical infrequency of back-over accidents when Simplicity manufactured Shoff's mower. Simplicity claims its position is further strengthened by the fact that Simplicity was aware of just two back-over accidents since 1983 with the model that Shoff purchased. App. 72. We agree that such accidents were infrequent. In fact, the Berriers themselves cite the CPSC letter to the OPEI acknowledging "accidents are infrequent." However, the serious nature of the injuries that do result must be factored into the equation along with the frequency of occurrence. Accordingly, we believe the district court did not give adequate weight to the fact that the letter concerning adding an NMIR feature to any revised ANSI standard stated: "the population at risk and the severe mental trauma to the child's family fully support the need to take immediate steps." App. 548-49.

We therefore conclude that the district court failed to assign adequate weight to this factor in favor of Berriers under the summary judgment standard.

69

## 4. Consequences of Imposing a Duty

The district court acknowledged that the average cost of $9.00 per mower of incorporating a NMIR device was minimal. 413 F. Supp. 2d at 448. It certainly is. The court nevertheless weighed this factor against the Berriers because they "failed to propose a feasible design alternative that would reduce the likelihood of back-over blade accidents while maintaining the social utility of the product." *Id*. at 448. Thus, in the court's view, imposing such a duty would be "superfluous." *Id.*

However, for reasons we have already explained, we believe that the Berriers did offer evidence of alternative designs. The Berriers' evidence of effective alternative designs included: (1) the experience of other manufacturers with NMIR devices, particularly the MTD experience; (2) the recent OPEI/ANSI standard requiring NMIR protection; and (3) evidence that Simplicity itself advocated roller barriers because they provide effective back-over protection. Other Simplicity models had the barrier, and Simplicity's former Vice President of Engineering from 1983 to 1999 testified that the roller blade offers some protection. App. 518.

Given the minimal cost of adding an alternative design, and the potentially monumental financial and human cost of not doing so, this factor clearly weighs heavily in favor of a duty.

## 5. Public Interest

The court concluded that the public interest weighed against the existence of a duty to alter Simplicity's design based on its belief that there was no genuine issue of material fact as to the effectiveness "of the proposed features, from rollers to an NMIR device with override," as well as the devalued social utility of a mower with such a device and the resulting burden on Simplicity of becoming the insurer of its products. 413 F. Supp. 2d at 448.

In reaching that conclusion, the court improperly conflated a cost/benefit analysis with its consideration of the public interest, as well as an analysis of the consequences of imposing the duty on Simplicity. For example, the court reasoned that imposing the duty would not only "devalue the *social utility* of the mower, preventing its ability to cut grass in a time-effective and efficient manner, but also would *transform Simplicity into an insurer* of its products in violation of Pennsylvania law." 413 F. Supp. 2d at 448 (citing *Azzarello*, 391 A.2d at 1024) (emphasis added). The court thereby incorporated its erroneous balancing of the second and fourth factors of the *Althaus* test and added the weight of those factors to the fifth factor.

Unlike the district court's analysis, the Pennsylvania Supreme Court's analysis of the public interest in *Phillips* did not consider cost/benefit or the consequences to the manufacturer. Instead, the Court simply concluded that

> [t]here is a strong public interest in minimizing fires started as a result of children playing with butane lighters. Such fires have catastrophic effects on human

71

beings as well as property.  Avoidance of them would be an unquestionable boon to society.  Thus, this factor weighs in favor of finding a duty.

841 A.2d at 1010.

Nevertheless, Simplicity claims that the public interest is not advanced by imposing an additional duty on the manufacturer and thereby supplanting the obligation of parental supervision.  According to Simplicity, the NMIR device has an unproven ability to reduce a risk and, if required, would increase the risk to the operator, while decreasing product utility.  Simplicity does not, however, explain how the risk increases for the operator, nor does it explain why such devices became the industry standard after 2003 if it decreased the mower's utility and increased the risk to the operator.

The Berriers maintain that this is precisely the kind of situation where the public interest is served by imposing a duty of care.  The marginal costs of designing a product with an NMIR feature are coupled with the benefit of reducing severe physical injury to children.  We agree.

### 6. The End Result of the Balancing.

Thus, viewed in the light most favorable to the non-moving party, we believe that four out of five of the *Althaus* factors weigh in favor of finding that Simplicity owed Ashley a duty to incorporate some kind of back-over device on Shoff's mower.

72

We also believe that there is sufficient evidence to create a genuine issue of material fact as to whether an alternative design would have prevented Ashley's injuries. Therefore, we will vacate the district court's order granting Simplicity's motion for summary judgment on the negligence claim and remand for further proceedings.

## IV. CONCLUSION

Because we have predicted that the Pennsylvania Supreme Court would adopt the Restatement (Third) of Torts, §§ 1 and 2, we hold that summary judgment should not have been granted to Simplicity on the Berriers' claim of strict products liability. Thus, we will vacate the district court's order granting summary judgment to Simplicity on that claim. Moreover, for the reasons we have explained, we will also vacate the grant of summary judgment to Simplicity on the Berriers' negligence claim. We will remand both claims to the district court for further proceedings consistent with this opinion.