PRECEDENTIAL
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-3678
_____

DELAWARE & HUDSON RAILWAY COMPANY, INC.
doing business as CANADIAN PACIFIC RAILWAY;
SOO LINE RAILROAD COMPANY doing business as
CANADIAN PACIFIC RAILWAY;
CANADIAN PACIFIC RAILWAY LIMITED,
                                        Appellants

v.

KNOEDLER MANUFACTURERS, INC.;
DURHAM INDUSTRIAL SALES, INC.

_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 1-11-cv-00314)
District Judge:  Hon. Sean J. McLaughlin
_____

Argued
September 9, 2014

Before: FISHER, JORDAN, and HARDIMAN, *Circuit Judges.*

(Filed: January 9, 2015)
_____

Scott D. Clements, Esq.
J. Lawson Johnston, Esq.
Dickie, McCamey & Chilcote
Two PPG Place – Ste. 400
Pittsburgh, PA   15222

Gregory N. Longworth, Esq.   [ARGUED]
James L. Wernstrom, Esq.
Clark Hill
200 Ottawa Avenue, NW – Ste. 500
Grand Rapids, MI   49503
        *Counsel for Appellants*

Matthew R. Planey, Esq.  [ARGUED]
Crabbe, Brown & James
500 S. Front Street – Ste. 1200
Columbus, OH   43215

Stuart H. Sostmann, Esq.
Marshall, Dennehey, Warner, Coleman & Goggin
600 Grant Street – Ste. 2900
Pittsburgh, PA   15219
        *Counsel for Appellee, Knoedler Manufacturers Inc.*

George T. McCool, Jr., Esq.   [ARGUED]
Wright & O'Donnell
15 East Ridge Pike – Ste. 570
Conshohocken, PA   19428
        *Counsel for Appellee, Durham Industrial Sales Inc.*

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

This case requires us to determine the scope of federal preemption under the Locomotive Inspection Act ("LIA"), 49 U.S.C. § 20701.  Appellant Delaware & Hudson Railway Company, Inc., doing business as Canadian Pacific Railway, and its subsidiaries (collectively, with the parent company, "Canadian Pacific") settled lawsuits brought by its employees who had suffered injuries as a result of defective train seats.  Canadian Pacific then brought indemnification, contribution, and breach-of-contract claims against Knoedler Manufacturing, Inc. ("Knoedler"), which supplied the seats, and Durham Industrial Sales, Inc. ("Durham"), which tried unsuccessfully to repair the seats.  Upon motions filed by Knoedler and Durham (collectively the "Appellees"), the United States District Court for the Western District of Pennsylvania dismissed Canadian Pacific's claims, holding that they were preempted by the LIA.  We disagree and will vacate the District Court's orders of dismissal and remand for further proceedings.

## I.  BACKGROUND

### A.  *Statutory and Regulatory Background*

The LIA provides that "a locomotive … and its parts and appurtenances" must be "in proper condition and safe to operate without unnecessary danger of personal injury."[1]  49 U.S.C. § 20701(1).  Pursuant to the LIA, the Federal Railroad Administration, which acts under the authority of the Secretary of Transportation, 49 U.S.C. § 103(a), has promulgated regulations on the governing standards of care

---

[1] The LIA was previously known as the Boiler Inspection Act ("BIA"), which covered only locomotive boilers.  Act of Feb. 17, 1911 ch. 103, § 2, 36 Stat. 913, 913-14.  In 1915, Congress amended the BIA's scope to cover the entire locomotive and its parts and appurtenances.  Act of Mar. 4, 1915, ch. 169, § 1, 38 Stat. 1192, 1192.  It provides:

> A railroad carrier may use or allow to be used a locomotive or tender on its railroad line only when the locomotive or tender and its parts and appurtenances –
>
> (1) are in proper condition and safe to operate without unnecessary danger of personal injury;
>
> (2) have been inspected as required under this chapter and regulations prescribed by the Secretary of Transportation under this chapter; and
>
> (3) can withstand every test prescribed by the Secretary under this chapter.

49 U.S.C. § 20701.

for locomotive equipment, including seats, 49 C.F.R. § 229.119(a) (requiring locomotive seats to "be securely mounted and braced").

While the LIA and its regulations provide binding standards for the suppliers of locomotives and locomotive equipment, as well as for railroad companies, 49 U.S.C. § 21302(a)(1); 49 C.F.R. § 229.7(b), the statute does not provide a private right of action to employees injured by defective equipment. *Urie v. Thompson*, 337 U.S. 163, 188-89 (1949). Instead, an injured employee must bring an action against his employer under the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51 *et seq*. The LIA supplements the FELA "by imposing on interstate railroads an absolute and continuing duty to provide safe equipment" and has the "purpose and effect of facilitating employee recover[y]." *Urie*, 337 U.S. at 188-89 (citation and internal quotation marks omitted).

Once an employer has been found liable in a FELA action, "it accords with the FELA's overarching purpose to require the employer to bear the burden of identifying other responsible parties and demonstrating that some of the costs of the injury should be spread to them." *Norfolk & W. Ry. Co. v. Ayers*, 538 U.S. 135, 165 (2003); *see also Ellison v. Shell Oil Co.*, 882 F.2d 349, 353 (9th Cir. 1989) ("FELA's purpose of providing recovery for injured workers is not defeated by permitting an employer to recoup its losses in part or in full from a third party, when the circumstances and state law permit.").

5

*B. Factual History*[2]

General Electric ("GE") built and maintained the locomotives at issue in this case, under a contract it had with Canadian Pacific. Pursuant to that agreement, Canadian Pacific directed GE to install seats purchased from Knoedler. GE complied, and Knoedler "agreed to provide seats of suitable quality to prevent seat failures, and suitable for use in Canadian Pacific's locomotives, in the future." (App. at 50.)

In the late 1990s and early 2000s, GE and Canadian Pacific became aware of problems with seat safety and identified defects that were causing the seats to break. GE discussed the nature of the defects and the repair process with Knoedler but grew concerned that Knoedler would be unable to make the necessary repairs. To allay that concern, Knoedler introduced GE to Durham and "promised that Durham had the expertise and capacity to repair the seats on Knoedler's behalf." (Appellant's Opening Br. at 6-7.)

GE and Durham subsequently entered into a contract under which "Durham agreed to refurbish the Knoedler Seats in such a way as to prevent future seat failures." (App. at 51.) Despite those repair efforts, the seats continued to break and, as a consequence, four Canadian Pacific employees were

---

[2] Because the District Court dismissed Canadian Pacific's first and second amended complaints in response to the Appellees' Rule 12(b)(6) motions to dismiss, we accept as true all facts alleged in Canadian Pacific's amended complaints and draw all reasonable inferences in favor of Canadian Pacific. *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).

6

injured. The railroad eventually settled with its employees for a total of approximately $2.7 million. Thereafter, it sought to recoup its losses from Knoedler and Durham.

## C. *Procedural History*

Canadian Pacific filed this action against Knoedler and Durham on December 16, 2011, asserting claims for indemnification, contribution, breach of contract (with Canadian Pacific claiming the rights of a third-party beneficiary), product liability, and negligence under Pennsylvania law. On March 9, 2012, Knoedler filed a motion to dismiss the complaint. In response, the railroad filed its First Amended Complaint on March 30, 2012, reasserting the same claims but clarifying that the claims were based on the Appellees' violations of the LIA and their breach of contractual promises to provide LIA-compliant seats.[3] Shortly thereafter, Durham and Knoedler filed their motions to dismiss the First Amended Complaint.

On February 12, 2013, the District Court issued an Order and Memorandum Opinion dismissing Canadian Pacific's indemnification and contribution claims with prejudice,[4] concluding that they were preempted by the LIA.

_____

[3] Canadian Pacific later withdrew its product liability and negligence claims at a hearing held on January 24, 2013.

[4] The District Court's first Order and Memorandum Opinion references only Canadian Pacific's indemnification claims, not its contribution claims. The parties evidently agree that the Court was addressing both indemnification and contribution, and it appears to us, based on the District Court's first Order granting the Appellees' motions to

The Court also dismissed the breach-of-contract claims, saying that the company had not adequately pled its status as a third-party beneficiary. The Court did, however, allow Canadian Pacific to amend its contract claims, and it did so, providing additional details about its standing as a third-party beneficiary of the contracts. On August 1, 2013, the Court issued a second Order and Memorandum Opinion dismissing the breach-of-contract claims, concluding that they were also preempted under the LIA. Canadian Pacific timely appealed both of the District Court's Orders.

## II.    DISCUSSION[5]

Canadian Pacific raises two arguments on appeal: first, that its indemnification and contribution claims are not preempted by the LIA because they are premised on a violation of federal standards set by the LIA and

---

dismiss, that the Court in fact dismissed both the indemnification and the contribution claims but simply referred to those claims in short as being for indemnification.

[5] The District Court had subject matter jurisdiction under 28 U.S.C. § 1332(a)(3). Durham had argued that the Court did not have personal jurisdiction over it, but because the Court dismissed this matter on preemption grounds alone, the personal jurisdiction issue was not addressed. Nothing in our disposition of this matter implies any opinion on any argument Durham may, upon remand, seek to advance on personal jurisdiction. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291 and we exercise plenary review over the orders of dismissal. *Grier v. Klem*, 591 F.3d 672, 676 (3d Cir. 2010).

8

accompanying regulations, and, second, that its breach-of-contract claims are not preempted by the LIA because they are premised on a violation of express contractual duties. We address those arguments in turn.

### A.    Preemption of Canadian Pacific's Indemnification and Contribution Claim

Congressional power to preempt state law derives from the Supremacy Clause of the Constitution, which provides that federal law "shall be the supreme Law of the Land … any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. "Consideration of issues arising under the Supremacy Clause start[s] with the assumption that the historic police powers of the States [are] not to be superseded by … [federal law] unless that [is] the clear and manifest purpose of Congress." *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 516 (1992) (first, second, and fourth alterations in original) (citation and internal quotation marks omitted). "Often Congress does not clearly state in its legislation whether it intends to pre-empt state laws … ." *Malone v. White Motor Corp.*, 435 U.S. 497, 504 (1978). When that is the case, "courts normally sustain local regulation of the same subject matter unless it conflicts with federal law or would frustrate the federal scheme, or unless the courts discern from the totality of the circumstances that Congress sought to occupy the field to the exclusion of the States." *Id.* At issue here is that latter type of exclusion, known as "field preemption."

The paramount cases concerning preemption under the LIA are *Napier v. Atlantic Coast Line Railroad*, 272 U.S. 605 (1926), and *Kurns v. Railroad Friction Products Corp.*, 132

9

S. Ct. 1261 (2012). *Napier* involved challenges to two state statutes: a Georgia statute that required fire boxes on locomotives to be equipped with an automatic door, and a Wisconsin statute that required locomotives to have cab curtains.[6] *Napier*, 272 U.S. at 607. The Supreme Court held that the LIA preempted both state statutes because it was "intended to occupy the field" pertaining to "the design, the construction, and the material of every part of the locomotive and tender and of all appurtenances." *Id.* at 611, 613. *Napier* thus concluded that only the Interstate Commerce Commission – the agency then responsible for implementing the LIA – had the authority to "set[] the standard" by which a locomotive's "fitness for service shall be determined." *Id.* at 612.

The Supreme Court recently revisited the preemptive effect of the LIA in *Kurns*, in which it affirmed our decision upholding the dismissal of an action for injuries from

---

[6] Both the Georgia and Wisconsin statutes addressed health and safety concerns. The automatic door on fire boxes protected firemen from exposure to extreme temperatures while stoking the furnace powering the locomotive; it protected the firemen's eyesight by reducing glare from the fire (and consequently protected travelers for whom firemen kept a lookout when the railroad crossed highways); and it protected employees and the train itself in the event of an explosion in the fire box. *Napier*, 272 U.S. at 609-10. Cab curtains prevented snow from piling into the locomotive cabs in the winter months and provided some measure of protection against wind and cold temperatures, thereby protecting engineers and firemen from discomfort and weather-related illnesses. *Id.* at 610.

defective locomotive parts. 132 S. Ct. at 1270. The plaintiffs in *Kurns* asserted design-defect and failure-to-warn claims against locomotive equipment manufacturers. Specifically, the plaintiffs argued that, under Pennsylvania law, the equipment was defectively designed because it contained asbestos and that the manufacturers failed to warn them about dangers posed by asbestos exposure. *Id.* at 1264-65. The Supreme Court rejected those claims, recognizing that they were "directed at the equipment of locomotives," *id.* at 1269, and "f[e]ll within the [preempted] field … as … defined in *Napier*," *id.* at 1270. In so ruling, the *Kurns* Court also rejected the plaintiffs' argument that "the LIA's pre-emptive scope does not extend to state common-law claims, as opposed to state legislation or regulation." *Id.* at 1269. The Court noted that *Napier*'s "categorical conclusion [of LIA preemption] admits of no exception for state common-law duties and standards of care." *Id.*

Knoedler and Durham incorrectly read *Napier* and *Kurns* to say that all state claims regarding the design and manufacture of locomotive equipment are preempted by the LIA. But those decisions did not speak so broadly. They were explicit in holding, and only holding, that a state may not impose its own duties and standards of care on the manufacture and maintenance of locomotive equipment. *See Kurns*, 132 S. Ct. at 1269 ("We therefore conclude that state common-law duties and standards of care directed to the subject of locomotive equipment are pre-empted by the LIA."); *Napier*, 272 U.S. at 613 ("[R]equirements by the states [regarding locomotive equipment] are precluded, however commendable or however different their purpose."). The question left unanswered by *Napier* and *Kurns* is whether the LIA preempts a state claim that is premised on a violation

11

of the duties and standards of care stemming from the LIA itself; in other words, whether a state claim based on a federal standard of care is preempted. We conclude that it is not.

While there is no Supreme Court authority exactly on point, there are plenty of strong hints that such an avenue to relief is not foreclosed. The Court has held in other statutory contexts that violations of federal law can be redressed through state common-law claims. *See, e.g.*, *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 258 (1984) (concluding that a state-law remedy based on a violation of the Atomic Energy Act was not preempted); *see also Abdullah v. Am. Airlines, Inc.*, 181 F.3d 363, 367 (3d Cir. 1999) (noting that "[f]ederal preemption of the standards of care can coexist with state and territorial tort remedies" and holding that state law remedies for a violation of the Federal Aviation Act were not preempted).[7] More particularly, in the context of railroad

---

[7] *Silkwood* and *Abdullah* are instructive even though they involved express preemption clauses because the Atomic Energy Act and the Federal Aviation Act also occupy their particular fields. *Silkwood*, 464 U.S. at 240-41, 249 (stating with respect to the Atomic Energy Act that "the federal government has occupied the entire field of nuclear safety concerns, except the limited powers expressly ceded to the states" (internal citation and quotation marks omitted)); *Abdullah*, 181 F.3d at 367 ("[W]e hold that [the Federal Aviation Act] establishes the applicable standards of care in the field of air safety, generally, thus preempting the entire field from state and territorial regulation."); *see also Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008) (noting that even if a statute contains an express preemption clause, "the scope of the statute [could still] indicate[] that Congress intended

safety laws, state-law claims have been permitted as a means to redress federal violations. For example, in *Crane v. Cedar Rapids & Iowa City Railway Co.*, the Supreme Court stated that a railroad employee can enforce a violation of the Safety Appliance Acts ("SAAs"), 49 U.S.C. § 20301 *et seq*., through the FELA but that a "nonemployee must look for his remedy to a common law action in tort, which is to say that he must sue in a state court, in absence of diversity, to implement a state cause of action."[8] 395 U.S. 164, 166 (1969). The Court

federal law to occupy the legislative field"). The Appellees argue that *Silkwood* and *Abdullah* are inapplicable because, as distinguished from the LIA which is silent on the point, Congress indicated in the Atomic Energy Act and the Federal Aviation Act that state common-law remedies would remain available. *Silkwood*, 464 U.S. at 251 ("[T]he only congressional discussion concerning the relationship between the Atomic Energy Act and state tort remedies indicates that Congress assumed that such remedies would be available."); *Abdullah*, 181 F.3d at 375-76 (noting that the Federal Aviation Act's Savings and Insurance Clauses suggest that Congress did not intend to preempt state-law remedies). Those cases stand for the larger premise, however, that even when Congress has occupied a particular field, state-law claims to remedy federal violations are not necessarily preempted.

[8] Knoedler argues that Canadian Pacific is "standing in the shoes of its employees" and therefore "is not, in a technical sense, a 'non-employee'" able to assert state claims under *Crane*. (Knoedler Br. at 42.) But the FELA specifically defines who is considered an "employee" and Canadian Pacific does not fall within that definition. *See* 45 U.S.C. § 51 ("Any employee of a carrier, any part of whose

13

had in fact reached that same conclusion almost three decades earlier in *Tipton v. Atchison Tulsa, & Santa Fe Railway Co.*, when it stated that the SAAs "do not give a right of action for their breach, but leave the genesis and regulation of such action to the law of the states." 298 U.S. 141, 147-48 (1936). Thus, the Court could say a few years later that there is no longer any question "as to the power of the state to provide whatsoever remedy it may choose for breaches of the [SAAs]. The federal statutes create the right; the remedy is within the state's discretion." *Breisch v. Cent. R.R. of N.J.*, 312 U.S. 484, 486 (1941).

Those cases are particularly relevant here, as the SAAs are analogous to the LIA in many important respects. The SAAs, like the LIA, regulate locomotive equipment.[9]    49

---

duties … shall be the furtherance of interstate or foreign commerce; or shall, in any way … affect such commerce as above set forth shall … be considered as being employed by such carrier in such commerce and shall be considered as entitled to the benefits of this chapter."). Furthermore, Knoedler's argument that Canadian Pacific is not an employee – so it has no cause of action under the FELA – but at the same time is an employee – so it cannot bring state-law claims for LIA violations either – sets up a needless no-win scenario for railroads. *See infra* at pp. 13-14.

[9] The SAAs differ from the LIA in that they expressly require certain safety equipment to be used on railroad carriers, such as automatic couplers, efficient hand brakes, secure ladders with handholds or grab irons, and power brakes sufficient to stop the train. 49 U.S.C. § 20302. The LIA, however, more generally requires that a locomotive and all its parts and appurtenances be in proper condition, safe to

14

U.S.C. § 20302. Indeed, the "congressional purpose underlying [the LIA] is basically the same as that underlying [the SAAs]" – namely that locomotive equipment "be employed in active service without unnecessary peril to life or limb." *Urie*, 337 U.S. at 190 (citation and internal quotation marks omitted). Furthermore, neither the LIA nor the SAAs provide for private enforcement; instead, railroad employees can only enforce those statutes through the FELA. *Urie*, 337 U.S. at 188-89. "In this view, [the SAAs], together with the [LIA], are substantively if not in form amendments to the [FELA]." *Id.* at 189.

With respect to preemption, both the LIA and the SAAs have broad preemptive scope. *See Kurns*, 132 S. Ct. at 1267 ("Congress, in enacting the LIA, 'manifest[ed] the intention to occupy the entire field of regulating locomotive equipment.'" (alteration in original) (quoting *Napier*, 272 U.S. at 611)); *Gilvary v. Cuyahoga Valley Ry. Co.*, 292 U.S. 57, 60-61 (1934) ("So far as the safety equipment of [railroad] vehicles is concerned, [the SAAs] operate to exclude state regulation whether consistent, complementary, additional, or otherwise."). It is true that *Napier* suggested that the scope of the SAAs' preemption is limited to the specific equipment listed in the statute, *Napier*, 272 U.S. at 611, but both *Crane* and *Tipton* involved a coupler, which is expressly covered by the SAAs, *Crane*, 395 U.S. at 165; *Tipton*, 298 U.S. at 145. Thus, the full preemptive effect of the federal law was operative with respect to that equipment and yet the Supreme Court allowed state common-law actions

---

operate, and adequately inspected and tested. 49 U.S.C. § 20701.

15

to remedy violations of the SAAs.[10]  Like the LIA, the SAAs are silent as to whether state remedies are preempted.[11] Despite that silence, the Supreme Court decided in *Crane* and *Tipton* that relief under state law was not preempted.[12]

---

[10] *Tipton*'s approval of *Walton v. Southern Pacific Co.*, 48 P.2d 108 (Cal. Ct. App. 1935), is also telling.  In *Walton*, the California Court of Appeals applied the state's statute of limitations to a wrongful-death claim alleging a violation of the LIA, relying in part on cases involving the SAAs. *Walton*, 48 P.2d at 115.  The Supreme Court expressly approved that analysis, stating that the *Walton* court "[c]orrectly [held] that the same principles apply in an action under [the LIA] as in one under [the SAAs]." *Tipton*, 298 U.S. at 151.

[11] As discussed previously, *supra* note 7, the Appellees discounted *Silkwood* and *Abdullah* as being irrelevant in part because Congress had indicated with respect to the statutes at issue in those cases that state-law remedies would be excluded from preemption.  That argument fails with respect to the SAAs, further confirming that the *Crane* line of cases are meaningful to the question of the preemptive scope of the LIA.

[12] Our dissenting colleague argues that *Crane*, *Breisch*, and *Tipton* have little legal force in light of *Kurns*, and that, to the extent they are still viable decisions, they should be read as only applying to the SAAs, not the LIA.  Dissent slip op. at 10-12.  But nothing in the *Kurns* opinion undercuts or calls into question the SAAs line of cases; in fact, the Supreme Court did not once mention any of those cases in its decision. Especially given the similarities between the LIA and the SAAs, if the Supreme Court had intended to cast doubt on the

16

Furthermore, congressional intent – which is "the ultimate touchstone of preemption analysis," *Abdullah*, 181 F.3d at 365 (citation and internal quotation marks omitted) – suggests that state law remedies are not preempted under the LIA. Congress's silence with respect to state-law remedies "takes on added significance in light of [its] failure to provide any federal remedy" for LIA violations. *Silkwood*, 464 U.S. at 251 (analyzing Congressional intent regarding the scope of preemption under the Atomic Energy Act). If we were to hold that state law claims asserting a violation of the LIA are preempted, railroads would be left with no remedy, no matter how obvious or egregious the liability of an equipment supplier.[13] We are not commenting on the culpability of the

_____

vitality of its decisions in the context of the SAAs, it would have done so explicitly. Although the dissent accuses us of giving "short shrift to *Kurns*," Dissent slip op. at 7, we are faithfully applying the holding of *Kurns*, instead of unnecessarily and, in our view, unwisely expanding its language to cover the situation at issue here, as the dissent would do.

[13] The dissent contends that it is "crystal clear" that the purpose of the LIA was not to protect railroads from lawsuits. Dissent slip op. at 2. But Congress did intend to protect railroads' interests through the LIA, as we explained in our opinion in the *Kurns* case: "The goal of the LIA is to prevent the paralyzing effect on railroads from prescription by each state of the safety devices obligatory on locomotives that would pass through many of them." *Kurns v. A.W. Chesterton Inc.*, 620 F.3d 392, 398 (3d Cir. 2010), *aff'd sub nom. Kurns*, 132 S. Ct. 1261 (citation and internal quotation marks omitted). The dissent clearly agrees that the LIA does have that purpose, given that one of the primary arguments in

17

Appellees here but are simply noting that Canadian Pacific cannot sue them directly under the LIA because the LIA does not provide for a private right of action. Similarly, Canadian Pacific cannot sue them under the FELA because that statute gives a remedy only to railroad employees. "It is difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured by illegal conduct." *Silkwood*, 464 U.S. at 251. And yet that would be the result if Canadian Pacific's state law indemnification and contribution claims are preempted.[14]

---

the dissent is that allowing state-law claims to redress LIA violations will threaten national uniformity of railroad safety regulations. In so arguing, however, our colleague is essentially saying that the LIA was intended both to protect railroads from conflicting state regulations and also to purposefully exclude railroads from obtaining judicial recourse in a case like this. We consider that outcome inconsistent and untenable.

[14] The Appellees contend that the Ninth Circuit has rejected the argument that the lack of a legal remedy should weigh in an analysis of the preemptive effect of the LIA. That court said in *Law v. General Motors Corp.*, that, "[b]ecause railroad operators are liable for any injuries suffered by their employees, they would not buy locomotives, cars and other equipment that fall short of [LIA] standards." 114 F.3d 908, 912 (9th Cir. 1997). Knoedler relies on that to argue that, if Canadian Pacific believes that Knoedler sells a defective product, "it can see that justice is done by not buying equipment from Knoedler or using a locomotive with a Knoedler component again." (Knoedler Br. at 34.) We decline to adopt that analysis. While market forces may have a long-term impact on the conduct of equipment

18

There are other railroad-related cases in which the Supreme Court has approved, in fact encouraged, the use of state-law claims to redress violations of federal law. For example, in *Norfolk & Western Railway Co. v. Ayers*, the Court declined to allow the defendant railroad to have FELA damages apportioned to third-party tortfeasors who contributed to plaintiffs' asbestos-related injuries. 538 U.S. at 143. The problem was not with making the third-party tortfeasors share the load. The problem was with making that sharing a matter of dispute in the FELA action, so that the injured employee had to engage in the fight over apportioning fault. The Supreme Court stated that "[o]nce an employer has been adjudged negligent … it accords with the FELA's overarching purpose to require the employer to bear the burden of identifying other responsible parties and demonstrating that some of the costs of the injury should be spread to them." *Id.* at 165. In so concluding, the Court relied on the "numerous FELA decisions … recognizing that FELA defendants may bring indemnification and contribution actions against third parties under otherwise applicable state or federal law." *Id.* at 162.

One of those FELA decisions was *Engvall v. Soo Line Railroad Co.*, in which the Supreme Court of Minnesota held that, in circumstances nearly identical to those here, state-law claims redressing violations of the LIA are not preempted. *See* 632 N.W.2d 560, 571 (Minn. 2001) (holding that a

manufacturers, they do not provide a remedy for losses already incurred because of the violations of governing standards of care. If Congress intended to foreclose all legal remedies available to railroad companies seeking to recoup FELA damages, it likely would have said so plainly.

19

railroad's third-party complaint seeking contribution and/or indemnification from an equipment manufacturer to recoup FELA losses was not preempted because the railroad's claims were based on violations of the LIA, not state standards). The District Court rejected *Engvall*, noting that it has been criticized by other courts.[15] But the one Court we must attend to most carefully, the Supreme Court, favorably cited *Engvall* twice in *Ayers* as an example of a case where a railroad was able to recoup its FELA losses through state-law indemnification and contribution claims. *Ayers*, 538 U.S. at 162 n.21, 164 n.23.

---

[15] The District Court also relies on a number of cases reaching a conclusion arguably at odds with *Engvall*, but those cases are distinguishable because they are either actions by railroad employees who already had a remedy under the FELA, or they involved causes of action asserting state standards of care, as opposed to federal standards of care. *See Stevenson v. Union Pac. R.R. Co.*, No. 4:07CV00522BSM, 2009 WL 129916, at *1 (E.D. Ark. Jan. 20, 2009) ("[Union Pacific] seeks contribution and indemnification from Seats based on theories of breach of warranty, negligence, and strict liability."); *Bonner v. Union Pac. R.R. Co.*, No. CV03-134-S-MHW, 2005 WL 1593635, at *10 (D. Idaho 2005) ("Nowhere in this statement is the Court able to discern an argument that GM-EMD violated the federal standard imposed by LIA."); *Roth v. I & M Rail Link, L.L.C.*, 179 F. Supp. 2d 1054, 1063-64 (S.D. Iowa 2001) ("Roth was a railroad employee, and here a federal cause of action under FELA exists."); *Union Pac. R.R. Co. v. Motive Equip., Inc.*, 714 N.W.2d 232, 234 (Wis. Ct. App. 2006) (rejecting Union Pacific's assertion that the manufacturer was liable for negligence, strict products liability, and breach of warranties).

Furthermore, the policy behind preemption does not support excluding the state-law claims at issue here. The primary rationale for federal preemption in the field of railroad safety regulation is national uniformity. Preemption allows railroad carriers to abide by a single set of national equipment regulations, instead of having to meet different standards and, potentially, to change equipment when a train crosses state lines. *Kurns v. A.W. Chesterton Inc.*, 620 F.3d 392, 398 (3d Cir. 2010), *aff'd sub nom. Kurns*, 132 S. Ct. 1261 ("The goal of the LIA is to prevent the paralyzing effect on railroads from prescription by each state of the safety devices obligatory on locomotives that would pass through many of them." (citation and internal quotation marks omitted)). It is therefore clear why *Napier* and *Kurns* did not allow states to impose their own standards of care – either through state regulations or through state tort liability – with respect to locomotive equipment. But the enforcement under state law of a federal standard of care does not undermine national uniformity because it does not impose conflicting regulations that a railroad must heed during interstate travel.

Congress itself has indicated that the goal of uniform railroad operating standards is not undermined when state-law claims are used to enforce federal law. For example, Congress explicitly stated in the Federal Railroad Safety Act that state law claims seeking damages for federal violations are not preempted. 49 U.S.C. § 20106(b)(1). If Congress thought state claims alleging a failure to comply with federal railroad safety laws would jeopardize uniformity, then it would have declared the elimination rather than the saving of such claims. And the Federal Railroad Administration – the agency responsible for implementing the LIA as well as the Federal Railroad Safety Act – has confirmed that state-law

21

claims can be used to enforce a federal standard of care. *See* Passenger Equipment Safety Standards; Front End Strength of Cab Cars and Multiple-Unit Locomotives; Final Rule, 75 Fed. Reg. 1180, 1208 (Jan. 8, 2010) ("[The Federal Railroad Administration] was careful to convey that Federal preemption under [the Federal Railroad Safety Act] applied to standards of care under State law – as opposed to claims (causes of action) under State law. They are different."). It is also noteworthy that state courts already interpret the LIA because FELA claims based on violations of the LIA that are filed in state courts cannot be removed to federal court.[16] 28 U.S.C. § 1445(a).

---

[16] That fact alone negates the dissent's contention that allowing state-law remedies for LIA violations poses a significant threat to national uniformity, Dissent slip op. at 4-6. Because state courts are already interpreting the LIA, any danger to uniformity, to the extent it can be called a danger, is already present. There is always a possibility that, at the margins, state courts will differ in their interpretations of the federal standard of care, but the Supreme Court has not expressed concern with that possibility and neither do we. Further, the hypothetical posed by the dissent – in which a person struck by a train could sue a railroad under strict liability in one state but not in another, Dissent slip op. at 4-5 – does not address differing standards of care. It only concerns whether a wanderer could sue under the LIA. It does not explain how differing state laws that affect who may sue would result in differing substantive standards directed at railroads.

In light of the foregoing, the District Court erred in holding that Canadian Pacific's indemnification and contribution claims are preempted.

###### B.      *Preemption of Canadian Pacific's Breach-of-Contract Claims*

Canadian Pacific's breach-of-contract claims also should have survived the motions to dismiss. As noted earlier, the railroad argues that both Knoedler and Durham breached their contractual obligations to supply GE with LIA-compliant seats. Claiming the status of a third-party beneficiary to those contracts, Canadian Pacific seeks relief for those breaches.

Much of the analysis described above with respect to the indemnification and contribution claims also applies to the breach-of-contract claims. Just as there is room for state tort remedies, there is room for state contract remedies associated with the federal standards embodied in the LIA. The breach-of-contract claims do not require Knoedler or Durham to comply with a state duty or standard of care. Instead, Canadian Pacific seeks to enforce contractual provisions that call for compliance with federal law. Enforcing the contracts would therefore not detrimentally affect national uniformity of railroad operating standards. Uniformity is to be expected because it is in the interest of the contracting parties. Having one set of national regulations to follow is important both to railroads and to equipment suppliers for the obvious reason that neither wants to deal with a multiplicity of possibly conflicting state standards. Therefore, in delineating their duties under a contract, the railroads and their suppliers will be fully motivated to ensure

23

that all provisions regarding equipment design and manufacture are based on a uniform federal standard of care.

But even if the LIA did preempt Canadian Pacific's indemnification and contribution claims, it would not follow that the LIA preempts the breach-of-contract claims, because breach-of-contract claims involve voluntarily assumed duties as opposed to duties imposed by state law.[17] "[W]hen a party to a contract voluntarily assumes an obligation to proceed under certain state laws, traditional preemption doctrine does not apply to shield a party from liability for breach of that

---

[17] Knoedler argues that Canadian Pacific is impermissibly attempting to circumvent the absence of a private right of action in the LIA by restating its tort claims as breach-of-contract claims. Knoedler relies on *Astra USA, Inc. v. Santa Clara County*, in which the Supreme Court held that plaintiffs could not sue on a form contract implementing a statute when the statute itself provided no private right of action. 131 S. Ct. 1342, 1345 (2011) (applying § 340B of the Public Health Services Act, which imposes ceilings on prices drug manufacturers may charge for medications sold to healthcare facilities). But, as discussed above, the Supreme Court in *Crane* allowed enforcement of the SAAs through state-law claims even when there was no private right of action. *See supra* pp. 10-12 (discussing *Crane* and the SAAs). Furthermore, *Astra* is distinguishable as it involved "form agreements" that "simply incorporate[d] statutory obligations and record[ed] the manufacturers' agreement to abide by them" but "contain[ed] no negotiable terms." *Id.* at 1348. Here, the contracts at issue involved negotiated duties voluntarily assumed by the parties that, Canadian Pacific alleges, explicitly required LIA-compliant seats.

agreement." *Epps v. JP Morgan Chase Bank, N.A.*, 675 F.3d 315, 326 (4th Cir. 2012). There is a salutary "you've made your own bed, now lie in it" quality to several cases from the Supreme Court that emphasize the importance of voluntarily assumed contractual obligations. *See Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 228 (1995) ("We do not read the [Airline Deregulation Act]'s preemption clause … to shelter airlines from suits alleging no violation of state-imposed obligations, but seeking recovery solely for the airline's alleged breach of its own, self-imposed undertakings."); *Cipollone*, 505 U.S. at 526 (plurality opinion) (holding that a breach-of-warranty claim was not preempted by the Federal Cigarette Labeling and Advertising Act because "a common-law remedy for a contractual commitment voluntarily undertaken should not be regarded as a requirement … imposed under State law" (alteration in original) (internal quotation marks omitted)); *see also Nw., Inc. v. Ginsberg*, 134 S. Ct. 1422, 1432-33 (2014) (holding that the Airline Deregulation Act preempted claims alleging breach of an implied covenant because, under the controlling state law, parties could not contract out of such covenants – and thus they were "regarded as state-imposed" – but noting that if a state permitted parties to voluntarily surrender protections from covenants, then those claims would "escape pre-emption").

That some of those cases involved express preemption as opposed to field preemption does not change the analysis. The same principle applies, regardless of the breadth of preemption: duties voluntarily undertaken cannot be considered as "state imposed." Because *Kurns* concluded only that "state common-law duties and standards of care" are preempted by the LIA, *Kurns*, 132 S. Ct. at 1269, – and not

voluntary contractual duties – even the broad field preemption of the LIA does not rule out Canadian Pacific's breach-of-contract claims.[18]

To hold that the LIA preempts all breach-of-contract claims would allow, and perhaps encourage, manufacturers to make grand contractual promises to obtain a deal and then breach their duties with impunity. Knoedler's and Durham's only response to the perverse incentives inherent in their arguments is a shoulder shrug. "Let the market sort things out," they say. As counsel for Durham put it at oral argument, "the people who are being put upon by this lack of remedy are not your average consumers; they are railroads, in this case a huge railroad, with incredible economic power to buy or not buy from various people." (Oral Arg. at 23:25-43.) But even the rich and powerful are entitled to the rule of law, and we see no reason to believe that Congress meant for Darwinian attrition to replace legal remedies.

---

[18] The District Court erroneously relied on cases holding that breach-of-contract claims were preempted under the Carmack Amendment. The Carmack Amendment is a comprehensive federal regulatory scheme pertaining to interstate carrier liability for loss or damage to shipments. *Certain Underwriters at Interest at Lloyds of London v. United Parcel Serv. of Am., Inc.*, 762 F.3d 332, 334 (3d Cir. 2014) ("Congress first comprehensively addressed interstate carrier liability in the Carmack Amendment … ."). Those cases are readily distinguishable because, unlike the LIA, the Carmack Amendment provides a federal private right of action. *Id.* ("Shippers may bring a federal private cause of action directly under the Carmack Amendment against a carrier for damages.").

26

## V.  CONCLUSION

Canadian Pacific's state law claims of indemnification and contribution based on the LIA are not preempted, nor are its breach-of-contract claims.  We will therefore vacate the District Court's Orders dismissing the First and Second Amended Complaints and remand for further proceedings consistent with this opinion.

*DELAWARE & HUDSON RAILWAY COMPANY, INC., et al. v. KNOEDLER MANUFACTURERS, INC., et al.*, No. 13-3678

HARDIMAN, *Circuit Judge*, dissenting.

This is a field preemption case arising under the Locomotive Inspection Act (LIA). Just two years ago the Supreme Court had occasion to consider and clarify the LIA's preemptive scope in *Kurns v. Railroad Friction Products Corp.*, 132 S. Ct. 1261 (2012). There, the Court held that state common law tort claims related to railroad safety are preempted by the LIA. This appeal requires us to decide whether the LIA's broad preemptive scope extends to state law tort and breach of contract claims based on federal standards. The question defies an easy answer, but on balance, I read *Kurns* to indicate that the LIA preempts all state law causes of action, even those based on federal standards of care. Accordingly, I respectfully dissent.

I

Our decision turns largely on how we read *Kurns*, which teaches that the LIA preempts a large swath of state law claims related to railroad safety (all those based on duties derived from state common law). Should we, in this case, take the next logical step on the path *Kurns* has laid out and hold that the LIA preempts *all* state law claims related to railroad safety, regardless of whether those claims are based on state- or federal-law duties? Or should we depart from that path to carve out an exception for state common law claims based on federal standards?

I would take the next logical step and hold that the LIA preempts all state law claims in the field of railroad safety, including those at issue in this appeal, for three reasons. First, doing so is consistent with the LIA's simple but important

purpose—protecting railroad workers. Second, neither *Kurns* nor the case upon which it principally relies, *Napier v. Atlantic Coast Line Railroad*, 272 U.S. 605 (1926)), suggests that there is an exception to the LIA's otherwise broad preemptive scope for state law causes of action based on federal standards of care. Finally, the majority's decision to the contrary strips *Kurns* of much of its practical significance while simultaneously threatening national uniformity in railroad law.

A

Congressional purpose suggests that state law causes of action based on federal locomotive safety standards are within the field preempted by the LIA. "[T]he prime purpose of the [LIA] was the protection of railroad employees and perhaps also of passengers and the public at large from injury due to industrial accident." *Urie v. Thompson*, 337 U.S. 163, 191 (1949) (internal citation omitted). And whatever ancillary purposes the LIA is intended to serve, one thing is crystal clear: protecting *railroads* from lawsuits isn't one of them. In fact, Congress intended to protect employees and other vulnerable parties *from* railroads and their potentially subpar safety measures. Thus, unlike my colleagues, *see* Maj. Typescript at 17, I'm neither surprised nor troubled by the notion that the LIA would leave railroads like Canadian Pacific with no remedy for injuries such as those alleged here. And the absence of a remedy in no way reduces the incentives railroads have to ensure that their locomotives "are in proper condition and safe to operate," and to closely inspect locomotive parts (like the defective seats that led to this case) for possible defects, *see* 49 U.S.C. § 20701—in fact, it incentivizes railroads to be even more careful when inspecting their locomotives for safety hazards, since they cannot pass on LIA liability to others. That such

2

increased safety would come at the expense of highly regulated railroads is no surprise, and should not influence our decision.[1]

In addition, Congress knew when it enacted the LIA (originally known as the Boiler Inspection Act) that the Federal Employers' Liability Act (FELA), 45 U.S.C. § 51 *et seq.*, provided a remedy for employees but not for railroads.[2] For over 90 years, Congress has not provided railroads a remedy for injuries they suffer as a result of LIA violations. That failure is unsurprising, consistent as it is with the LIA's purpose—a purpose which is furthered by the role of FELA in providing a remedy to injured railroad workers.

Second, *Kurns* and *Napier* in no way suggest that the LIA's broad preemptive scope includes a tacit exception for railroads to recoup FELA damages in state law causes of action based on federal standards of care. Instead, *Napier* held merely that the LIA "was intended to occupy the field," citing the "broad scope of the authority conferred upon the [regulatory body charged with promulgating regulations under the LIA]" as evidence of that preemption. 272 U.S. at 613. And *Kurns* teaches that there is "no exception" in that preempted field for

---

[1] The majority speculates that "[i]f Congress intended to foreclose all legal remedies available to railroad companies seeking to recoup FELA damages, it likely would have said so plainly." Maj. Typescript at 19 n.14. In light of the LIA's purpose, it is even more likely that if Congress did *not* intend for railroads to shoulder the entire LIA regulatory burden, it would have said so plainly.

[2] The Boiler Inspection Act, which was passed after FELA, worked so closely with FELA that the Court called it "substantively if not in form [an] amendment[] to the Federal Employers' Liability Act." *Urie*, 337 U.S. at 189.

3

state standards of care. 132 S. Ct. at 1269. Neither case provides any reason to believe that a remedy lies outside of FELA for non-employees injured as a result of LIA violations.

Finally, I disagree with my colleagues that the primary goal of preemption—national uniformity—would not be undermined by allowing state law causes of action using standards of care derived from the LIA. *See* Maj. Typescript at 21–22. Instead, I am convinced that allowing such causes of action would threaten uniformity significantly while at the same time undercutting the Court's decision in *Kurns*. To understand why, consider the text of the LIA, under which locomotives and locomotive parts and appurtenances must be "in proper condition and safe to operate without unnecessary danger of personal injury." 49 U.S.C. § 20701(1). These requirements are amorphous, to say the least. What is "proper condition?" What is "safe to operate?" Whose "unnecessary danger of personal injury" is to be considered? The LIA does not answer these questions, and it would seem obvious that hundreds of state and federal courts will answer them in multifarious ways. And in doing so, they will undermine uniformity in the national regulatory scheme.

A simple example illustrates the disparate results today's decision will propagate: A person crossing a track is struck by a train through no fault of the train operator. No workers or passengers on the train are injured. The train is equipped with industry-standard braking equipment, but the injured person claims that a better brake design could and should have been used. The railroad is sued under a strict liability theory citing the LIA's "proper condition and safe to operate without unnecessary danger of personal injury" language as the applicable standard that the railroad failed to meet. But does the injured person even have standing to sue under the LIA? A court deciding this

4

question would turn to state law to determine whether only a worker or passenger of a railroad could sue under such a theory, and state law will often differ on this question.[3] Answering that question will affect the court's interpretation of the LIA's substantive standard of care, as it directly pertains to *whose* "unnecessary danger of personal injury" is relevant under the federal standard. Railroads will be subject to different rules in various states, and will have to adapt their equipment and policies to each state's decision regarding which parties could sue under the LIA. This is an untenable result.

These are the types of legal interpretations that state courts make every day in evaluating causes of action in various factual contexts. Negligence, for example, is a failure to "exercise reasonable care under all the circumstances." Restatement (Third) of Torts: Physical & Emotional Harm § 3 (2010). This standard, like the standard of care in the LIA, is

---

[3] Some states follow the Third Restatement of Torts, which "does not limit a strict liability cause of action to the 'user or consumer,' and broadly permits any person harmed by a defective product to recover in strict liability." *Berrier v. Simplicity Mfg., Inc.* 563 F.3d 38, 54 (3d Cir. 2009) (noting that Wisconsin, California, Mississippi, Arizona, Missouri, Michigan, Iowa, Alabama, Utah, and Vermont do so). But other states have declined to adopt the Third Restatement, and might limit recovery only to a consumer or user of the product—in this case, a worker or passenger of the train. *See, e.g.*, *Tincher v. Omega Flex, Inc.*, 2014 WL 6474923, at *62 (Pa. Nov. 19, 2014) (declining to adopt the Third Restatement's approach to strict liability, despite the Third Circuit's prediction that it would do so in *Berrier*, 563 F.3d at 53).

general by design. To ascertain its meaning in a given context, trial courts consider a variety of factors, not the least of which may include "countervailing principle[s] or polic[ies]." *Id.* at § 7. State courts must and will construe the LIA's required duties just as they normally would construe standards of care in other state law contexts—that is, by considering ordinary state policy concerns.

In doing so, state courts will necessarily inject state law policies into what is, according to the majority, an LIA-derived duty. This is exactly what *Kurns* prohibits. *Kurns*'s ban on state law standards of care is uncontroverted, yet actions based on those standards will implicitly be permitted under our decision today, which strips *Kurns* of much (if not all) of its effect. It does so because the LIA's federal standard of care is so broad that most state law claimants who would otherwise be barred by *Kurns* will be able to avoid that bar by cloaking their state law claims in the garb of the LIA. *Kurns* should not be gutted in this manner.[4]

In sum, because the LIA protects workers and not railroads, because the Supreme Court has not so much as hinted at an exception for federal standards of care in the LIA's broad

---

[4] The majority correctly notes that state courts already interpret the LIA through FELA actions filed in state court. But that fact is immaterial to the question presented in this appeal because we all agree that Congress, by enacting FELA, has eschewed national uniformity in favor of providing a remedy to injured railroad workers who sue their employers. *Kurns* demonstrates that this policy-based exception to national uniformity does not extend even to cases in which railroad workers sue non-employers—let alone cases, like this one, in which *railroads* sue under the LIA.

preemptive scope, and because doing so would seriously undermine national uniformity, I would hold that the LIA preempts state law causes action falling within the preempted field, even when they are based on federal standards of care.

## II

After giving short shrift to *Kurns*, a recent Supreme Court decision that arises under the LIA, the majority relies on older cases that arise under other federal laws. *See* Maj. Typescript at 12–16. Although these decisions have some relevance to this appeal, they involve laws that differ in meaningful ways from the LIA. Perhaps even more significant is the fact that they were decided before *Kurns*, so they are devoid of the Court's reasoning in its most recent exposition of LIA preemption.

First, the majority leans on *Abdullah v. American Airlines, Inc.*, 181 F.3d 363 (3d Cir. 1999), and *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238 (1984), for the proposition that "in other statutory contexts . . . violations of federal law can be redressed through state common-law claims." Maj. Typescript at 12. My colleagues are correct that in some contexts the Supreme Court *has* allowed violations of federal law to be redressed through state law causes of action. But there are critical differences between those contexts and the LIA, and *Abdullah* evinces a prominent difference. The law interpreted in that case, the Federal Aviation Act (FAA), preempted the field of aviation safety but also included a savings clause that explicitly preserved "other remedies provided by law," including state law claims. *Abdullah*, 181 F.3d at 374–75. The LIA doesn't have a savings clause. The majority suggests that the savings clause is unimportant because *Abdullah* "stands for the larger premise . . . that even when Congress has occupied a

7

particular field, state-law claims to remedy federal violations are not necessarily preempted." Maj. Typescript at 12–13 n.7. But if state law claims were permissible in any event, why did the FAA include a savings clause? Because the savings clause does no work under this interpretation, the majority violates the canon against superfluity, *see Clark v. Rameker*, 134 S. Ct. 2242, 2248 (2014); *United States v. Menasche*, 348 U.S. 528, 538–39 (1955) (citing *Inhabitants of Montclair Twp. v. Ramsdell*, 107 U.S. 147, 152 (1883)). The better view is that the LIA's lack of a savings clause is a meaningful difference between it and the FAA.

*Silkwood* involves the Atomic Energy Act, a federal law that, unlike the LIA, is not accompanied by a comprehensive federal remedial scheme. 464 U.S. at 241. As the majority recognizes, even in the absence of a savings clause in the Atomic Energy Act, Congress indicated that it assumed state tort remedies would remain available within the preempted field. As the Court noted, "there [was] no indication that Congress even seriously considered precluding the use of such remedies" in passing the law. *Id.* at 251. In contrast, the LIA evidences no desire by Congress to permit state law remedies to remain available within the locomotive safety field. In fact, the existence of a federal remedial statute (FELA) is a strong indication that those remedies did *not* remain available. FELA provides a remedy for LIA violations just as state law claims did for the Atomic Energy Act. If there were a federal remedial statute like FELA for the Atomic Energy Act, the *Silkwood* Court would have had no reason to find it "difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured by illegal conduct." *Silkwood*, 464 U.S. at 251.

The *Silkwood* Court's assumption that Congress would not leave persons injured by violations of the Atomic Energy Act without a remedy is consistent with that Act's purpose of protecting the public from an emerging and potentially dangerous form of energy while at the same time promoting the development of the atomic energy industry. *See* 42 U.S.C. § 2012. It would make little sense to pass a law "in order to protect the public," while depriving the public of a way to enforce that protection. *Id.* § 2012(i). Conversely, it makes perfect sense that Congress did not intend to permit private actions in the particular context presented by this case: a railroad attempting to recover under the LIA. Unlike the *Silkwood* plaintiff (the administrator of the estate of an employee of an atomic energy company), a railroad like Canadian Pacific is outside the protective scope of the LIA. "[T]he prime purpose of the [LIA] was the protection of railroad employees . . . ." *Urie*, 337 U.S. at 191. FELA already provides a remedy for railroad employees who suffer injury as a result of LIA violations; thus, Congress could—and, in my view, did—foreclose state law causes of action based on LIA violations with nary a concern about leaving railroad workers without a remedy.

The cases dealing with the Safety Appliance Acts (Appliance Acts)—*Crane v. Cedar Rapids & Iowa City Railway Co.*, 395 U.S. 164 (1969); *Breisch v. Central Railroad of New Jersey*, 312 U.S. 484 (1941); and *Tipton v. Atchison, Tulsa & Santa Fe Railway Co.*, 298 U.S. 141 (1936)—are more germane to this appeal because there are some superficial similarities between the Appliance Acts and the LIA. As the majority points out, both the Appliance Acts and the LIA regulate locomotive equipment, and neither provides for private enforcement— instead, injured employees must seek a remedy under FELA, and there is no statutory remedy for non-employees. Maj.

9

Typescript at 15. And, as with the LIA, the Appliance Acts preempt their field of regulation and Congress gave no explicit indication that state law causes of action should remain available under them, yet nonemployees may seek redress for violations of the Appliance Acts via common law causes of action. *Crane*, 395 U.S. at 166.

But rote application of these precedents to this appeal overlooks the importance of the Supreme Court's more recent and more relevant decision in *Kurns*. The effect of the Appliance Acts cases on the LIA is at least questionable after *Kurns*. *Crane*, decided 45 years ago, held that the defense of contributory negligence in an Appliance Act suit was not preempted. 395 U.S. at 167. Contributory negligence, a standard feature of common law negligence actions, is defined by state common law. Yet *Kurns* prohibits the use of a state law standard of care in a case related to railroad safety. *Kurns*, 132 S. Ct. at 1269. Given the Court's clear statement that state law has no place in defining duties in the field of railroad safety, I think it unlikely the Court would permit a state standard of care to be used, as *Crane* allows, as part of an affirmative defense. *Id.* (noting that the "categorical conclusion" that the LIA preempts the field of locomotive safety "admits of no exception for state common-law duties and standards of care"). In my view, then, if *Crane* retains vitality after *Kurns*, it must be read to apply only to the Appliance Acts, and not to the LIA.

*Breisch* and *Tipton*, the other Appliance Acts cases cited by the majority, raise a similar concern. Both cases recognize that the Appliance Acts "leave the genesis and regulation of [rights of action based on breach of the Appliance Acts] to the law of the states." *Tipton*, 298 U.S. at 148; *accord Breisch*, 312 U.S. at 486. As *Tipton* noted, the Appliance Acts created an "absolute duty" for employers—if employers fall below that

statutory standard of care, they are negligent under state law. 298 U.S. at 146. But under *Tipton*, state law standards of care may still play a significant (and, under *Kurns*, prohibited) role: although a railroad's violation of the Appliance Acts means that it is negligent, a railroad's compliance with the Appliance Acts does not mean that it is *not* negligent. *See* Restatement (Third) of Torts: Physical & Emotional Harm § 16 (2010) ("[C]ompliance with a pertinent statute, while evidence of nonnegligence, does not preclude a finding that the actor is negligent . . . for failing to adopt precautions in addition to those mandated by the statute."). Thus, under *Tipton* and *Breisch*, a particularly safety-conscious state could hold railroads to a more stringent standard of care than that mandated in the Appliance Acts—a "potent method of governing conduct and controlling policy," that *Kurns* plainly precludes. *Kurns*, 132 S. Ct. at 1269 (quoting *San Diego Bldg. Trades Council v. Garmon*, 359 U.S. 236, 247 (1959)). Here again, although the Appliance Acts and the LIA share some traits, *Kurns* illustrates that cases construing the Appliance Acts do not necessarily apply in the LIA context.

Aside from the lack of a case analogous to *Kurns* that arises under the Appliance Acts, those Acts differ from the LIA in another critical way. As the majority acknowledges, the Appliance Acts contain some very specific requirements for railroads—"certain safety equipment [must] be used on railroad carriers, such as automatic couplers, efficient hand brakes, secure ladders with handholds or grab irons, and power brakes sufficient to stop the train." Maj. Typescript at 14 n.9 (citing 49 U.S.C. § 20302). The LIA, by contrast, merely requires that trains and their constituent parts be "in proper condition and safe to operate without unnecessary danger of personal injury." The Appliance Acts' veritable laundry list of requirements allows a court to decide a case based on them without reference to

11

common law, and with little interpretive discretion—either a train is equipped with the mandated parts, or it is not. The LIA's broad scope, as I noted in Part I, offers no such clear guidance, and will require courts to give meaning to its general instructions. State courts will do so by filling in the gaps with multifarious state policies and rules, contrary to the teaching of *Kurns*.

### III

The LIA's preemptive scope is broad—perhaps unusually broad, given recent Supreme Court preemption cases. *See Kurns*, 132 S. Ct. at 1270 (Kagan, J., concurring) ("Viewed through the lens of modern preemption law, *Napier* is an anachronism."). But we must follow the law as it specifically pertains to the LIA, and *Kurns* is the most germane pronouncement on the subject. I recognize that my view would leave Canadian Pacific, and other injured non-employees, without a remedy for LIA violations. "But it is for Congress to amend the statute to prevent such injustice. It is not permitted the Court to rewrite the statute." *Crane*, 395 U.S. at 167. The absence of a remedy under the LIA may be a tough pill for railroads to swallow, but it is the one I believe Congress prescribed. With respect, I dissent.